**BOEHRINGER INGELHEIM VET-MEDICA, INC., Boehringer Ingelheim/Nobl Laboratories, Inc., Regents of University of Minnesota and South Dakota State University, Plaintiffs,**

v.

**SCHERING–PLOUGH CORPORATION and Schering Corporation, Defendants.**

No. CIV. 98–5703(HAA).

United States District Court, D. New Jersey.

Oct. 26, 1999.

Jennifer Gordon, Jonathan A. Marshall, Scott D. Simpson, Pennie & Edmonds, New York City, H. Curtis Meanor, William Sandelands, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, NJ, for Plaintiffs.

. Sidney David, Paul H. Konchanski, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court on a motion filed by Boehringer Ingelheim Vetmedica, Inc. Boehringer Ingelheim/Nobl Laboratories, Inc., Regents of University of Minnesota and South Dakota State University (hereinafter collectively "Plaintiffs" or "Boehringer") seeking a preliminary injunction against Schering–Plough Corporation and Schering Corporation (hereinafter collectively "Defendants" or "Schering") pursuant to 35 U.S.C. § 283 (1988) for violating its patent.[1] For the reasons discussed below, Plaintiffs' motion is DENIED.

## I. *Background*

### A. Procedural History

This action and Plaintiffs' motion for a preliminary injunction follows this Court's denial of Plaintiffs' motion for a preliminary injunction with respect to Patent No. 5,476,778 ("the '778 Patent"), *see Boehringer Ingelheim v. Schering–Plough,* 984 F.Supp. 239 (D.N.J.1997) (hereinafter *"Boehringer I "*), and denial of both parties' motions for summary judgment regarding that patent. *See Boehringer Ingelheim v. Schering–Plough,* 6 F.Supp.2d 324 (D.N.J.1998) (hereinafter *"Boehringer II "*). Although the current action addresses Patent No. 5,840,563 ("the '563 Patent") rather than the '778 Patent, this action is based upon the same conflict between the parties over a vaccine for a disease known as Porcine Reproductive Respiratory Syndrome ("PRRS"). Familiarity with the Court's previous opinions is assumed.

In June 1997, this Court held a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995). On October 6, 1997 this Court denied Boehringer's preliminary injunction motion finding that Boehringer failed to demonstrate a likelihood of success on the merits given Schering's substantial defense of obviousness pursuant to 35 U.S.C. § 103(a). *See Boehringer I,* 984 F.Supp. at 258–259. Specifically, the Court found that Schering

---

1. This Court held a hearing on this matter from June 18 through June 25, 1999. Prior to that hearing, the parties submitted briefs in support of their position (cited herein as "Pl. Br."; "Def. Br."; "Pl. Reply Br.") In addition, the parties each submitted to the Court the following post-hearing papers: proposed findings of fact and conclusions of law and a critique of their adversary's submissions (cited, herein, as "Pl. Find. Fact No."; "Pl. Concl. Law No."; "Pl. Crit."; "Def. Find. Fact No."; "Def. Concl. Law No."; "Def. Crit.")

had presented a substantial defense that using MA–104 cells to grow the PRRS virus had been obvious to one of ordinary skill in the art at the time of Boehringer's invention based upon prior art relating to the growth of the swine influenza virus. In addition, in *Boehringer I*, this Court also found that Boehringer was not entitled to a preliminary injunction because it failed to establish irreparable harm from the Defendants' sale of a competing swine vaccine. *Id.* at 264. For those reasons, the Court declined to issue a preliminary injunction.

Shortly after the denial of Boehringer's motion for preliminary injunction, Schering filed a motion for summary judgment, Boehringer filed its own summary judgment motion and Boehringer renewed its motion for a preliminary injunction. By written opinion issued on April 27, 1998, this Court denied each of those motions. *See Boehringer II*, 6 F.Supp.2d 324. First, the Court denied Boehringer's motion for summary judgment finding that genuine issues of material fact remained regarding obviousness and infringement pursuant to the doctrine of equivalents. The Court also rejected Boehringer's renewed preliminary injunction motion finding that Boehringer still had not demonstrated either irreparable harm or that Schering's validity defense was devoid of substantial merit and thus it was "far from certain that Boehringer would be likely to succeed on the merit of its infringement claim." *Id.* at 338.

While the '778 Patent litigation was pending, Boehringer's patent application with the United States Patent Office (hereinafter either "Patent Office" or "USPO") for its '563 Patent was also pending. In November 1998, after the motion practice in the '778 Patent litigation was completed, the Patent Office issued to Boehringer the '563 Patent entitled "Method for Growing Swine Infertility and Respiratory Syndrome Virus" which named Danny Chla-

dek, David Gorcyca and Louis Harris as inventors. Shortly thereafter on December 17, 1998, Boehringer commenced the present action alleging that Schering had infringed its newly-issued '563 and '805 Patents and by motion filed on January 22, 1999 Boehringer moved for a preliminary injunction to preclude Schering from selling its allegedly infringing swine vaccine. Schering opposes Boehringer's newest request for a preliminary injunction and another preliminary injunction hearing was held before this Court in June 1999.

## B. Brief Factual History

The disease at the center of this dispute, PRRS, also known as Mystery Swine Disease ("MSD") and Swine Infertility and Respiratory Syndrome ("SIRS"),[2] infects pigs and causes them to give birth to dead or sickly piglets. In addition to these reproductive failure, PRRS also causes serious respiratory symptoms and other symptoms such as anorexia, fever, dyspnea, and neurological impairment. Both Plaintiffs and Defendants have marketed a vaccine for PRRS since June 1994 and July 1996, respectively. Tr. at 2.79, 2.92

As discussed *supra* Boehringer possesses several patents relating to its PRRS vaccine. According to Plaintiffs, "the '778 patent, . . ., claims methods of growing, isolating, and attenuating PRRS viruses in simian cells for vaccine preparation . . . . the '563 patent claims methods of growing the PRRS virus on simian cells, while the '805 patent claims cultures and compositions containing the PRRS virus." Pl. Br. at pp. 1–2.

While Plaintiffs' claim against Defendants for infringement of the '778 Patent is still pending and is scheduled for trial in approximately two weeks, the Court considers Plaintiffs' newly filed motion for preliminary injunction which alleges that Defendants have infringed Plaintiffs' '563 patent.[3] Specifically, the subject of the

---

2. The disease will be referred to as "PRRS" throughout this opinion.

3. Plaintiffs have limited the present motion to the '563 Patent although they contend that the

instant motion is Plaintiffs' contention that Defendants' sale of a swine vaccine for the prevention of PRRS has violated Claim 3 of the '563 Patent. Pl. Br. at p. 2.

Claim 1 of the '563 Patent, upon which Claim 3 is dependent, claims:

A method of growing swine infertility and respiratory syndrome virus comprising: (a) inoculating the swine infertility and respiratory syndrome virus on simian cells; and

(b) incubating the inoculated simian cells.

Pl. Br. Ex. A, col. 23, lines 14–18. Claim 2 states, "[t]he method of claim 1 wherein the simian cells are simian kidney cells." *Id.* at lines 19–20. Finally, Claim 3, the Claim in dispute, states, "[t]he method of claim 2 wherein the simian kidney cells are MA–104 simian kidney cells." *Id.* at lines 21–22. Plaintiffs contend that Defendants' swine vaccine literally infringes the '563 Patent and infringes that patent under the doctrine of equivalents.

## II. *Brief Summary of the Arguments*

Boehringer has requested a preliminary injunction to enjoin Schering from selling its swine vaccine and seeks a recall of Schering's current PRRS vaccines. Boehringer argues that the prior art which was the basis of this Court's denial of Boehringer's request for a preliminary injunction in the '778 litigation is not relevant to this patent based upon additional evidence gathered by Boehringer since the '778 preliminary injunction hearing. Specifically, Boehringer relies on the deposition testimony of six of Schering's experts to support its argument that growing the PRRS virus on MA–104 cells was not obvious. Therefore, Boehringer argues that this Court should enjoin Schering from infringing Boehringer's '563 Patent because there is no longer an issue that its invention is obvious and because it also satisfies the other requirements necessary for a preliminary injunction.

Defendants' actions also infringe the '805 pat-

In opposition to Boehringer's motion for a preliminary injunction, Schering challenges the validity and enforceability of Boehringer's '563 patent as well as Boehringer's ability to meet the other heavy showing required for a preliminary injunction. With respect to the likelihood of Boehringer's success on the merits, Schering asserts three defenses to the '563 Patent. First, Schering argues that the '563 Patent was not patentable under 35 U.S.C. § 103(a). Essentially, Schering argues that since "one of ordinary skill in the art would have a reasonable expectation that the SIRS virus would grow on simian cells and in particular MA–104," the '563 Patent is not valid. Def. Br. at p. 4.

Second, Schering argues that Boehringer's inequitable conduct during its presentation of the '563 and '778 Patents to the USPO invalidates the '563 Patent. Specifically, Schering argues that Boehringer's failure to direct the Patent Office's attention to the relevant prior art and provide the Patent Office with the pleadings, briefs and opinions of this Court from the'778 litigation amounted to inequitable conduct which invalidates the '563 Patent. Schering also argues that Boehringer's inequitable conduct before the USPO in its prosecution of the '778 Patent taints the '563 patent rendering it unenforceable. Third, Schering argues that the '563 Patent violates the written description requirement for a patent as articulated in 35 U.S.C. § 112 (hereinafter "section 112") because, in part, the specification is limited to virus ATCC–VR2322 and does not support Boehringer's broad generic claim.

With respect to Boehringer's showing of irreparable harm, Schering argues that Boehringer is not entitled to a presumption of irreparable harm because it has not made a strong showing of patent validity. Schering also argues that even if Boehringer were entitled to this presumption, the presumption is more than adequately rebutted by Schering's ability to compensate Boehringer in the event a finding of

ent. Plaintiffs' Br. at p. 2.

infringement is made. Schering also argues that as a matter of law this Court should reject Boehringer's argument that its loss of market share and its reduction in research expenditures is irreparable harm. Finally, with respect to the last two factors under the relevant test for a preliminary injunction, Schering argues that the balance of hardships militates against an injunction and that the public interest does not favor an injunction.

In response to Schering's obviousness challenge, Boehringer argues that the prior art relied upon by Schering "relates only to 'simian cells' generally, with MA–104 cells receiving only parenthetical treatment," Pl. Rep. Br. at p. 1, whereas the non-obvious innovation within Claim 3 is the growing of PRRS on M–104 cells, specifically. *Id.* Boehringer goes on to argue that the prior success growing viruses on MA–104 cells is restricted to the four examples shown by Schering which fails to satisfy the test set forth in section 103(a) and that those four examples are not instructive with respect to the PRRS virus. Boehringer also argues that (a) the USPO's issuance of the '563 Patent should be given deference by this Court, (b) that two of the articles relied upon by Schering actually "taught away" rather than encouraged the use of MA–104 cells in PRRS research and (c) the other prior art relied upon by Schering does not satisfy section 103. Boehringer also responds to Schering's inequitable conduct accusation by arguing that (a) the prior art relied upon by this Court in the '778 litigation, other pertinent prior art references and the existence of the '778 litigation to the Patent Office and the two patent examiners who reviewed the application for the '563 Patent (and not buried among irrelevant materials) and (b) Schering's argument is devoid of any allegation of intent, a required element for a successful claim of inequitable conduct. Pl. Rep. Br. at pp. 6–7. In

response to Schering's claim that the '563 Patent is invalid under section 112, Boehringer argues that both examiners of the USPO believed that Claim 3 was valid under that section and that the specification is not limited in the ways argued by Schering. Finally, Boehringer renews its arguments that it is entitled to a presumption of irreparable harm and that even without this presumption it has proven that it will suffer further irreparable harm if its request for a preliminary injunction is denied.

### III. *Summary of Testimony*

At the preliminary injunction hearing held before this Court in June 1999, Boehringer called the following witness: Dr. Easterday, Dr. Michael Murtaugh, Paul Hays and George Gould. Schering called Dr. Richard Steece, Dr. Robert Rowland and Harry Manbeck on its behalf. The following is a summary of the testimony.

### A. Boehringer's Witnesses

Dr. Easterday, an expert in virology with a long-standing history in the field of animal virology, testified about the state of the art of virology in 1991 and 1992. Dr. Easterday stated that at that time, the normal procedure a virologist would employ to grow a new unknown virus on a culture would be to first attempt to grow the virus on that homologous species. Tr. at 1.79–1.80.[4] The term "homologous species" means that species in which the virus in known to effect. For example, in this case since the virus effected swine, the first step would be to attempt to grow PRRS on swine cells. Tr. at 1.80. Thus, as Dr. Easterday explained, the first step would be to attempt to grow the new unknown virus on a cell line from the species which the virus is known to effect. *Id.* If this proves unsuccessful, Dr. Easterday said, the next step is to attempt to grow the unknown virus on whatever cell

---

**4.** References to "Tr." are references to the transcript of the preliminary injunction hearing held in June 1999.

lines are available to the research virologist and it is a matter of "trial and error." Tr. at 1.80–1.81.

With respect to the prior art that existed in 1991 on the use of MA104 cells to grow viruses, Dr. Easterday testified that the use of MA–104 cells was not obvious based upon prior art available at that time. Specifically, Dr. Easterday testified that the preeminent book of swine diseases, Diseases of Swine, available in 1991 taught that only one identified porcine virus was known at that time to grow on MA–104 cell lines. Tr. at 1.85–1.86; Pl. Exh. 16. Dr. Easterday identified that virus as porcine rotavirus which is "one of the viruses that infect swine responsible for enteric disease causing diarrhea of swine." Tr. at 3.5. Dr. Easterday testified that in 1991 a person of ordinary skill in the art would not have tried to grow PRRS on MA–104 cells because "there is one—one virus of a very different kind of disease that was demonstrated to have grown on MA–104 cells, and given the preponderance of other kinds of things, I don't think there is anything that leads one to consider that the MA–104 would have been a cell to try." Tr. at 3.5.

Dr. Easterday then reviewed three articles published prior to 1991 which discuss the mystery surrounding PRRS and the number of premier investigators of swine diseases who were unable to determine the cause of PRRS or successfully isolate and grow the virus. Tr. at 3.11–3.14. Dr. Easterday also discussed an article "Porcine Reproductive and Respiratory Syndrome" published in the Seventh Edition of the Diseases of Swine periodical in 1992. Tr. at 3.15. The etiology of the disease, as described by Dr. Easterday based upon this article, was premised upon discrediting several hypothesis that certain known infectious agents were the likely primary cause of PRRS such as African swine fever, cholera, hemagglutinnating encephalitis, porcine parvoviruus, classical swine influenza, encephalomyocarditis virus (commonly referred to as

EMC or EMCV), pseudorabies, porcine enterovirus or transmissible gastroenteritis virus. Tr. at 3.16–3.18; Pl. Exh. 76. Dr. Easterday explained that based upon this article, one who was trying to ascertain the causative agent of PRRS would not pursue any information regarding these eliminated causative agents. Tr. at 3.18.

Dr. Easterday also referred to four articles which Schering's experts relied upon in support of their obviousness argument. Tr. at 3.20; Pl. Exhs. 18–21. He summarized that Exhibit 18, the "Isolation and Serotyping of Porcine Rotaviruses and Antigenic Comparison with other Rotaviruses," published in 1984 speaks to rotaviruses "that were isolated from the intestinal contents of piglets, pigs with diarrhea using MA–104 cells." Tr. at 3.20; Pl. Exh. 18. Dr. Easterday explained that Exhibit 19 entitled "Simian Hemorrhagic Fever, Isolation and Characterization of a Viral Agent," published in 1968 relates to the isolation and characterization of a viral agent from rhesus monkeys which suffered a febrile hemorrhagic disease. Tr. at 3.20–3.21; Pl. Exh. 19. He explained that Exhibit 20 entitled "Use of Immunoelectron Microscopy to Show Ebola Virus during 1989 United States Epizootic," published in 1990, relates to the growth of a group of viruses related to Ebola that use MA–104 cells. Tr. at 3.21; Pl. Exh. 20. Finally, Dr. Easterday explained that Exhibit 21 entitled "Replication of Infectious Bursal Disease Virus in Continuous Cell Lines," published in 1986 relates to a chicken disease which was grown on three mammalian continuous cell lines including MA–104. Tr. at 3.21; Pl. Exh. 21.

Dr. Easterday was not aware of any other instances, apart from the four discussed in these articles which were identified by Schering's experts, in which a virus was grown on MA–104. Tr. at 3.21. Of these four viruses, Dr. Easterday explained that only one was a swine virus—rotavirus—such that an ordinary person trying to identify the causative agent of

PRRS would not have consulted that literature or found any of that literature helpful. Tr. at 3.21–3.22.

Dr. Easterday said that at the time of Boehringer's invention, he did not know that swine influenza virus grew on MA–104 cells even though there was a report by Dr. Mark Goldstein, et al. (hereinafter referred to as the "Goldstein article") in 1970 that swine influenza grew on simian cells. Tr. at 3.23; Pl. Exh. 22. Dr. Easterday explained that the Goldstein article taught that the simian cells were the least desirable of three cell lines tested by Dr. Goldstein to grow the swine influenza virus. Tr. at 3.24. Dr. Easterday also testified that it is was more common that swine influenza was cultured on embryonated chicken eggs and in fact, he could not recall any other articles documenting the growth of swine influenza on simian cells. Tr. at 3.23–3.24. Moreover, Dr. Easterday testified that nobody of ordinary skill in the art in 1991 would have looked to the swine influenza literature in researching PRRS because at that time, swine influenza "had been ruled out as a cause of the PRRS syndrome." Tr. at 3.25.

In addition, Dr. Easterday reviewed the Drs. Dea and Van Alstine articles relied upon by Schering and opined that neither article would have led one to grow PRRS on MA–104 and in fact, Dr. Van Alstine's failed attempts to grow PRRS on MA–104 cells would have steered investigators away from MA–104 cells. Tr. at 3.26–3.32. Dr. Easterday rendered the same opinion with respect to the 1990 Conference of Research Workers in Animal Disease which documented the successful inoculation of young pigs from PRRS, the unsuccessful attempts to locate the causative agent of PRRS but the successful attempts to rule out certain causative agents. Tr. 3.34–3.36. Dr. Easterday emphasized that without knowing what the causative agent of PRRS was, one would not know on what to grow PRRS. Tr. at 3.36.

On cross-examination, Dr. Easterday testified that in 1991, people seeking the cause of PRRS were not only using porcine cell lines but were also looking to swine influenza and pseudorabies as possible causes of PRRS. Tr. at 3.88–3.89. In addition, Dr. Easterday testified that in January 1991 he was aware that porcine viruses grew on simian cells from his knowledge of rotavirus research. Tr. at 3.89. Dr. Easterday also testified that prior to April 1991, it was common knowledge that one should try to grow viruses on heterological cells, i.e., from species other than the host species, and that in October 1990, Dr. Van Alstine had tried to isolate PRRS by using a small array including non-homogenous cells and a MA–104 cell line. Tr. at 3.104–3.105. Dr. Easterday concluded from this article, however, that one should not try the same cells as those tested by Dr. Van Alstine, including MA–104, because Dr. Van Alstine did not have success growing PRRS on those cell lines. Tr. at 3.107–3.108. He also testified that it did not appear that Dr. Van Alstine included MA–104 cells within the first test array, but added MA–104 cells after testing cells derived from swine testicles and baby hamster kidneys. Tr. at 3.115.

Dr. Michael Murtaugh testified at Boehringer's behest regarding the specification of the '563 Patent as an expert in veterinary pathobiology with a particular interest in infectious diseases which effect pigs. Tr. at 2.8–2.9, 2.14. Dr. Murtaugh defined ATCC VR–2332 ("VR–2332") as "the first PRRS virus, isolated and characterized in North America. That was the specific virus which was first isolated by Boehringer on MA–104 cells and then deposited in the American-type culture." Tr. at 2.23–2.24.

With respect to Schering's argument that the reference in the '563 Patent specification to VR–2332 only supports a claim for growing VR–2332 and not any other PRRS virus, Dr. Murtaugh opined that Boehringer's use of the term ATCC VR–2332 in the specification was not meant as a limitation but rather as a reference to virulent viruses that cause the PRRS disease. Tr. at 2.24–2.25. He based this

opinion on three different aspects of the specification of the '563 Patent. First, Dr. Murtaugh opined that the use of generic terms throughout the specification which define "infectious agent" as a "virus capable of causing swine infertility and respiratory syndrome ... Non-hemagglutinating enveloped RNA virus and zoopathogenic mutants thereof capable of causing swine infertility and respiratory disease in swine" supported a broader interpretation of the specification. Tr. at 2.24 (*quoting* Pl. Exh. A, column 3, lines 21–28). Dr. Murtaugh elaborated that the use of the term "zoopathogenic mutants" makes clear that there are multiple forms of the virus which are each capable of causing PRRS in swine. Tr. at 2.25.

In addition, Dr. Murtaugh opined that the references to VR–2332 as an example of the PRRS/SIRS virus and references in the specification to the existence of other viruses which were also examples of the PRRS/SIRS virus communicated to a person of ordinary skill in the art that VR–2332 was merely one isolate of the PRRS/SIRS virus such that its being named specifically in the specification is not a limitation to the invention. Tr. at 2.32. Finally, Dr. Murtaugh also supported this opinion with a reference in the specification to the fact that three examples of the PRRS virus had been cultured on MA–104 cells. Tr. at 2.33–2.34.

With respect to whether the specification of the '563 Patent only provides a description of a method for growing the PRRS virus "until CPE is observed," [5] Dr. Murtaugh testified that the '563 Patent was not so limited. Specifically, Dr. Murtaugh testified that the specification did not rely on CPE or any particular period of time for incubation but rather relies on scientific techniques. Tr. at 2.34–2.41. Dr. Murtaugh further opined that the specification was sufficient to allow a person of ordinary skill in the art to grow PRRS viruses other than VR–2332 on MA–104

cells because the "inventors provided a clear generic description for growth of the virus, which is not limited to 2332." Tr. at 2.41.

On cross-examination, Dr. Murtaugh conceded that the absence of Drs. Collins and Benfield's names in the '563 Patent as compared to the '444 application means that the specification no longer inform a reader who produced what information. Tr. at 2.56–2.59. Dr. Murtaugh maintained, however, that the reference to three isolates from three different herds demonstrated that the '563 Patent is not limited by its terms to the VR–2332 isolate, though he conceded that "[s]ubsequent analysis may reveal whether they [the three isolates] appear to be identical or not.". Tr. at 2.72–2.74.

Paul Hays, a Vice–President of Boehringer America and Head of Corporate Marketing at Boehringer Germany, also testified on Boehringer's behalf. Tr. at 2.77. Mr. Hays's testimony focused on Boehringer's sale of the PRRS vaccine under the names Respers ReproTM, Ingelvac PRRS, MLVTM and a combination vaccine which includes the PRRS vaccine as well as other swine vaccines. Tr. at 2.80. Mr. Hays stated that in 1994, Boehringer sold 7.7 million doses, in 1996 it sold 25 million doses and in 1998 Boehringer sold 15.7 million doses. Tr. at 2.81. According to Mr. Hays's analysis of Boehringer's financial data, after its peak in 1996 when Boehringer sold $19.5 million worth of the PRRS vaccine products, Boehringer's sales declined in the United States after Schering introduced its product to the market. Tr. at 2.82. Specifically, Mr. Hays stated that Boehringer's PRRS sales dropped from $19.5 million in 1996 to $16.8 million in 1997 and continued to decline thereafter. Tr. at 2.92–2.93.

Mr. Hays also explained that after July 1998, Boehringer's PRRS vaccine sales dropped approximately 40% which was

---

**5.** "CPE" refers to cytopathic effect which is a change in the microscopic appearance of a cell after infection with a virus or some observable effect shown on the simian cells.

made up of a 26% decline due to problems in the swine industry while the remaining 14% decline was attributable to Schering's presence in the market. Tr. at 2.83–2.88. Mr. Hays testified that the declining sale of Boehringer's PRRS vaccine (due to both Schering's vaccine and unrelated market forces) has caused Boehringer to reduce its U.S.-based research and development department. Mr. Hays also expressed concern that Schering's over-the-counter sales of its PRRS vaccine is injurious to Boehringer's prescription-only sales because swine producers may misdiagnose PRRS and use the Schering vaccine without success which would in turn cause them to lose interest and confidence in PRRS vaccines altogether. Tr. at 2.95–2.96.

Putting aside the recent losses in the latter half of 1998, Mr. Hays testified that Boehringer had PRRS sales of approximately $18 million in 1996, $15.7 million in 1997 and $9.8 million in 1998. Tr. at 2.90. Mr. Hays stated that these sales were a driving force in Boehringer's intentions to become a leader in the swine industry and represent moneys earned by Boehringer which in turn were used to further realize that goal by purchasing Fermenta Animal Health Products which markets a number of swine products. Tr. at 2.91. In addition, according to Mr. Hays, Boehringer also acquired NOBL Laboratories, another swine products company, and built a biological production facility in Missouri based on the then-existing and anticipated PRRS vaccine profits. Tr. at 2.91. Mr. Hays described the PRRS vaccine as a "wild success" which allowed Boehringer to get its "foot in the door" with swine producers. Tr. at 2.91–2.92. Mr. Hays testified further that Boehringer's combination PRRS vaccine which was introduced in 1998 is not countered by a similar product sold by Schering. Tr. at 2.117.

Mr. Hays testified that Boehringer is one of the largest privately-held drug companies in the world with 24,000 employees, business on every continent and revenues in 1998 of approximately $5.1 billion. Tr. at 2.112–2.114. Mr. Hays stated, however, that Boehringer's United States sales were $107 million in 1998 and the PRRS vaccine accounted for $12 million of these sales. Tr. at 2.115–2.116. Mr. Hays testified that Boehringer would neither go out of business or cease offering the PRRS vaccine if they did not receive a preliminary injunction in this case. Tr. at 2.116. Nor did Mr. Hays have any concern that Schering would not be able to pay any damage award ordered in this case if Boehringer prevailed after a full trial. Tr. at 2.122. Mr. Hays, however, expressed concern that if Boehringer did not receive immediate relief from Schering's infringing product, it would lose its advantage of having its "foot in the [swine producers'] door." In addition, Mr. Hays was concerned that swine producer's use of the PRRS vaccine only on sows may also limit further Boehringer's market share which is not reparable with money damages. Tr. at 2.106.

George Gould, an attorney at the law firm of Gibbons, Del Deo in Newark, New Jersey was the last witness to testify on behalf of Boehringer. Mr. Gould opined that Claim 3 of the '563 Patent is not misleading, but rather a "true representation of what a dependent claim would look like standing alone, when you read back from the claims on which it depends, what it tells you to do, which is to substitute certain words for other words." Tr. at 4.79–4.80. Mr. Gould also opined that there is nothing unusual about Boehringer's proceeding with the '563 Patent several years after prosecuting its '778 Patent. Tr. at 4.81.

Mr. Gould expressed opinions that Drs. Dea and Van Alstine's articles (a) do not render Boehringer's invention obvious and (b) that Boehringer's reference to these articles in its '563 application without highlighting them does not amount to inequitable conduct which would invalidate the Patent. Mr. Gould based his conclusion that Schering obviousness defense was insufficient on the fact that Boehringer's

competitors who were people of ordinary skill in the art worked on the same problem and had access to all of the same information and failed to isolate and grow the PRRS virus on MA–104 cells. Tr. at 4.85. Specifically, Mr. Gould disagreed strongly with the opinion of Schering's expert, Dr. Steece, who said that these references were optimistic. Tr. at 4.86. Mr. Gould thought that no patent examiner would read these two references optimistically and that there is no evidence that others in the field shared Dr. Steece's reading of the articles. Tr. at 4.86–4.87. Mr. Gould expressed the opinion that a patent examiner would view Dr. Dea's article teaching access to homogenates and incubation of such homogenates with Vero cells but without any indication of isolation of PRRS's causative agent. Tr. at 4.89. Mr. Gould concurred with Dr. Easterday's opinion that the Dr. Dea reference taught away the use of simian cells to culture the PRRS virus in the future. Tr. at 4.89.

With respect to Schering's inequitable conduct arguments, Mr. Gould further opined that the post–1992 amendment to the standard for inequitable conduct in 37 C.F.R. § 1.56 should apply to this case because the '563 Patent was pending at the time and the prior test was unworkable. Tr. at 4.83. He also considered the file history of the '563 Patent and testified that the file history "demonstrates on multiple occasions these references were considered by the patent examiner, and no rejection of the claims based on those references were ever made." Tr. at 4.91. Mr. Gould further testified that he had not seen any evidence that Boehringer intentionally buried the Drs. Dea and Van Alstine references in its '563 Patent application. Tr. at 4.95. He concluded that Schering did not have a substantial defense of inequitable conduct. Tr. at 4.82.

With respect to Schering's argument that Boehringer committed inequitable conduct by not submitting to the Patent Office copies of Schering's briefs from the '778 Patent litigation, Mr. Gould did not believe this amounted to inequitable conduct and thought that Boehringer's actions were consistent with a reasonable interpretation of its obligations under the law. Tr. at 4.97. Mr. Gould said that examiners, who have no legal training, do not want to be overwhelmed with litigation documents because their primary focus at that point is on the teachings of the prior art. Tr. at 4.98. He testified that he did not know what Boehringer should have done with the Court's opinion in the '778 litigation but thought that an examiner would not know the meaning of it or what to do with it. Tr. at 4.100. Mr. Gould also thought it was not necessary for Boehringer to provide the Patent Office with copies of Schering's briefs, as long as the underlying material information was made available to the examiner, which occurred in this case. Tr. at 4.102–4.103. Mr. Gould also suggested that if Boehringer submitted Schering's brief to the Patent Office Boehringer would have also had to submit the remainder of the '778 file to the Patent Office which would have overwhelmed the Patent Office. Mr. Gould believed that Boehringer had advised the examiner of the existence of the '778 litigation and its failure to provide to the Patent Office any documents from the '778 litigation showed its even handedness with respect to the '563 Patent application. Tr. at 4.103–105.

On cross-examination, it was established that this Court's opinion in *Boehringer I* denying Boehringer's preliminary injunction request was issued in October 1997 and Boehringer cited information to the Patent Office from that opinion but did not give the Patent Office a copy of the opinion. Tr. at 4.110. Mr. Gould clarified that in his opinion it is the examiner's responsibility to review and analyze prior art and the applicant need not submit to the examiner other people's opinions of the prior art, even if those opinions are from experts and a federal district court judge. Tr. at 4.111–4.113. With respect to Manual of Patent Examining Procedure (hereinafter

"MPEP") section 2001.06(c) entitled "Information from Related Litigation," Mr. Gould said that this section does not require the submission of court documents to the Patent Office but merely requires that an applicant submit to the Patent Office the underlying material information. Tr. at 4.116. Mr. Gould acknowledged, however, that if the examiner knew that the work of Drs. Collins and Benfield (which had been characterized as part of the invention), was really prior art, and determined that that research was material, the examiner would have had the right to rely upon that research in his obviousness determination. Tr. at 4.131. He said the corollary was also true, *i.e.*, if the examiner did not know that this research was prior art, he could not have used it in his obviousness determination. Tr. at 4.132.

Mr. Gould conceded that the examiner is the only person who can view prior art and determine whether it is material, especially in light of conflicting opinions as to the materiality and teachings of the prior art. Tr. at 4.137. Mr. Gould stated, however, that the handout distributed at the Livestock Conservation Institute Proceedings in October 1990 (hereinafter referred to as "L.C.I.") containing the Drs. Dea and Van Alstine references is not material to the '563 Patent and there was no obligation to disclose its existence to the examiners handling the '563 Patent. Tr. at 4.142–4.143. Mr. Gould also said that he would not have cited to the examiner the deposition testimony of Ms. Devlin, which Mr. Gould found confusing. TR. at 4.144. Indeed, Mr. Gould opined that Boehringer discharged its duty in the '563 Patent prosecution under section 2001.06(c) by sending the examiner the references listed in Gould Exhibit 2, Bates numbers 58449 through 58451. Tr. at 4.144–4.145.

On re-direct, Mr. Gould re-iterated the fact that the Drs. Collins and Benfield research as well as the Drs. Dea and Van Alstine references were presented to the examiner of the '563 Patent and the examiner affixed his initial next to those articles indicating that he had reviewed them in considering that patent. Tr. at 4.147.

## B. Schering's Witnesses

Schering called Dr. Richard Steece, a virologist, pathogenic bacteriologist and industrial microbiologist employed at the Association of Public Health Laboratories which is funded by the Federal Center for Disease Control to testify as an expert in human and veterinary virology. 3.129–3.132. Dr. Steece testified that at the end of 1990 hundreds of different cell cultures existed on which to grow diseases but that whenever he received an unknown animal virus, he would typically use a four-cell array composed of two primary monkey kidney cells, cynolmolgus and rheses, and two human cells, human diploid fiboblast cells and a transformed human heteroploid line. Tr. at 3.133–3.134. Dr. Steece explained that he chose these four cell lines based on his personal experience and training as well as the current state of the art regarding cell inoculation. Tr. at 3.134–3.135. He categorized simian cells as "generally the most permissive cells that we have available to us in virology." Tr. at 3.135. He testified that in the late 1970s when he was trained at the CDC, the CDC was recommending that scientist include a monkey kidney line in their viral diagnostic laboratory. Tr. at 3.138.

Dr. Steece reviewed the Dr. Dea reference and his methods of using four cells to grow PRRS—Vero cells, porcine fallopian tube, swine or porcine testicles and a baby hamster kidney— and opined that the use of two to four cell lines in an array is consistent with normal practices. Tr. at 3.143–3.144. Dr. Steece further opined that prior to April 1991, one skilled in the art with access to Dr. Dea's article would include a simian line in an array in an attempt to isolate a porcine virus which was causing respiratory and reproductive symptoms. Tr. at 3.145. He said that "[i]t would be very logical if an individual had a simian cell, that they would include it as part of their standard array." Tr. at

3.145. Dr. Steece said that the tone of Dr. Dea's article was very excited because at that time Dr. Dea thought he had isolated PRRS since it was not yet known that what he had really isolated was EMC such that one reading his article would try to replicate his methods and his results. Tr. at 3.146–3.148. With respect to Dr. Van Alstine's reference, Dr. Steece reviewed the cells used by Dr. Van Alstine and concluded that it was "very logical" for Dr. Van Alstine to include a simian cell in his array prior to 1991. Tr. at 3.151. As with the Dr. Dea article, Dr. Steece described the Dr. Van Alstine article as "extremely encouraging" because although Dr. Van Alstine did not isolate the PRRS virus he had some results isolating some rotavirus. Tr. at 3.152. He interpreted Dr. Van Alstine's comment "Don't put on blinders" to mean that investigators should not be overly narrow their focus and that "the jury is still out." Tr. at 3.153.

Dr. Steece strongly disagreed with Dr. Easterday's statement that finding a cell line on which to grow PRRS was a "crap shoot." Tr. at 4.5. Rather, Dr. Steece testified that cell lines are arranged because the investigator has a "reasonable expectation" that they will work and it is neither a matter of luck nor a "hit or miss situation" how arrays are chosen. Tr. at 4.5. Dr. Steece said that rather than luck, it is a cell line's permissiveness as well as the relevant science and information available that determines what cell lines should be used in an array. Tr. at 4.10. Dr. Steece said that without knowing which of his standard array would successfully grow a virus, he had a "reasonable expectation" that he would be successful with at least one of the cells. Tr. at 4.10. Dr. Steece opined further that one's expectations would be "very high" that one would isolate the PRRS virus in the array used by Dr. Van Alstine because the array contained a number of permissive cells that

grow a wide variety of viruses. Tr. at 4.15.

On cross-examination, Dr. Steece testified that he had only cultured one virus several times (a pseudorabies virus), had no experience with the PRRS virus and had never heard of the PRRS virus until he was contacted in connection with this litigation. Tr. at 4.18. Dr. Steece also stated that the majority of his experience with virus isolation was with the isolation of human viruses and not veterinary viruses. Tr. at 4.20. Dr. Steece further stated that the majority of isolations he conducted between 1980 and 1990 while he was the supervisor of the virology/serology section for the Scientific Laboratory Division in New Mexico was of human viruses and that the four cell array used at that lab was selected based on the types of samples that lab received, which rarely included swine viruses. Tr. at 4.22–4.23. Dr. Steece testified that while he was working at the laboratory in New Mexico, he sometimes used cell lines other than his standard four cell lines to isolate a virus but said this divergence from his usual array was due only to financial burdens associated with his usual array. Tr. at 4.27.

Dr. Steece admitted that the CDC only concerns itself with human pathogens and zoonotic viruses [6] and thus only recommends cell lines for human research. Tr. at 4.28. Dr. Steece stated that the CDC publication embodied in Defendant's Exhibit 62 was not used by the New Mexico lab to develop its cell arrays and in fact, he had no knowledge of how the New Mexico lab developed its four cell array. Tr. at 4.29. He also conceded that he did not include MA–104 cells in his standard array, nor did the array contain any continuous simian cell lines and that he did not even have MA–104 cells in his lab. Tr. at 4.30.

Dr. Steece restated his opinion that swine virologists knew that MA–104 was a permissive cell line and he based his opin-

---

**6.** A zoonotic virus is a virus which effects both humans and animals. It was established

in the '778 litigation that PRRS is a non-zoonotic virus.

ion upon his knowledge of the literature he had reviewed in preparation for this litigation but not on conversations he had with swine virologists. Tr. at 4.31–4.32. He admitted, however, that as of 1991 only about half of the animal diseases (including swine diseases) were grown on simian cells. Tr. at 4.32. He further distinguished that he now considers simian cells to be "very permissive," but that in 1991 it was known only that the were "permissive." Tr. at 4.32–4.33. Dr. Steece further acknowledged that a virologist trying to isolate PRRS in 1991 would consider the symptoms of PRRS in choosing an array and that there was no symptomatic resemblance between PRRS and the viruses known to grow on MA–104 cells as of 1991. Tr. at 4.35–5.36. He further stated that as reflected in his expert report, he was unaware of a single porcine virus with reproductive or respiratory symptoms that as of 1991 was known to grow on MA–104 cells. Tr. at 4.38. Dr. Steece further stated that the only virus Dr. Dea reported recovering on a simian cell culture was the EMC virus. Tr. at 4.40. Dr. Steece maintained, however, that the Dr. Dea article would be encouraging to one skilled in the art because Dr. Dea thought that EMC might be a contributing factor to PRRS. Tr. at 4.41–4.42.

Dr. Steece testified that one reading Dr. Van Alstine's article might conclude that he had isolated PRRS because he isolated swine influenza which Dr. Van Alstine suggested might be a causative agent of PRRS. Tr. at 4.45. Dr. Steece, however, did not know whether by late 1990 there was "good serological evidence" that swine influenza did not cause PRRS. Tr. at 4.45. Dr. Steece further acknowledged that Dr. Van Alstine did not identify in his article which of the cell lines he used, successfully grew the swine influenza virus. Tr. at 4.46. Indeed, Dr. Steece expanded his opinion and said that since Dr. Van Alstine failed to identify which cell line successfully grew swine influenza, one skilled in the art would have been motivated to try each of the cell lines used by Dr. Van Alstine.

Tr. at 4.47. He said an investigator would just have to try the cells and see if they worked without any expectation of which one would work over the next. Tr. at 4.47. Dr. Steece further testified that while one skilled in the art would have a high expectation that the virus would grow on his array he could not "draw on any one in particular," and would not have expected the simian cells to work to the "exclusion of all others." Tr. at 4.52. He also said that PRRS was not easily discovered, there were many theories as to its causative agent and nobody had been able to grow the PRRS virus and identify it as such. Tr. at 4.54.

With respect to Dr. Collins's article upon which Dr. Steece relied in developing his opinions regarding inequitable conduct, Dr. Steece testified first that this article conclusively showed that PRRS was caused by a virus but later stated that Dr. Collins's statement that "[t]o date, no microorganism has been isolated from the tissue homogenate used as the inoculum or from tissues collected from gnotobiotic piglets," does not use the word "virus" such that there is no written conclusion that Dr. Collins did in fact have a virus. Tr. at 4.49–4.50.

On re-direct, Dr. Steece clarified the basis for his opinion that the Dr. Van Alstine article made clear that he was dealing with a virus based on the filtering studies discussed in the articles. Tr. at 4.57.

Schering also called Dr. Robert Rowland to testify as an expert in PRRS pathogenesis, i.e., how the disease is caused and what the disease process is. Dr. Rowland's post-doctoral fellow work at the University of Minnesota focused primarily on studying the interaction between a virus known as "LDV," an arteri virus closely related to PRRS, and mice. Tr. at 5.6–5.7. Since 1994, Dr. Rowland has worked primarily with PRRS and focuses on how the virus replicates itself inside a cell and inside of a pig and the results of that

replication. Tr. at 5.8–5.9. At the time of the hearing, Dr. Rowland had not published any articles relating to his PRRS research but had two articles about to be published. Tr. at 5.9–5.10.

Dr. Rowland testified that prior to 1991 there were at least a thousand references to animal viruses being grown on cells derived from other animals. Tr. at 5.13–5.14. After the preliminary injunction hearing in the '778 litigation, Dr. Rowland also researched the literature available prior to April 1991 which described MA–104 as a permissive cell line and attached those articles to his expert report. Tr. at 5.15; Def. Exh. 7–21. He also researched references available prior to April 1991 demonstrating the culturing of porcine viruses on simian cells and found that swine influenza, pseudorabies, African swine fever virus, porcine enterovirus, swine vesicular disease virus, vesicular stomatitis virus, vesicular exanthema, porcine rotavirus, EMCV and porcine epidemic diarrhea virus and Japanese B encephalitis virus were known porcine viruses which were cultured on simian cells prior to April 1991. Tr. at 5.17–5.18; Schering Exh. 25–39.

Specifically, Dr. Rowland referred to an article by Goldstein, et al. published in 1969/1970 which discussed the growth of swine influenza on simian cells after it was passaged in eggs. Tr. at 5.21–5.22; Schering Exh. 37. He also referred to a book *Symposium of Diagnosis and Treatment of Swine Diseases* published in 1982 which includes a list of swine respiratory diseases, a number of which, according to Dr. Rowland, were known by 1991 to grow on simian cells. Tr. at 5.23. In addition, Dr. Rowland referred to references, such as an article published in 1986 in a book called *Veterinary Obstetrics and Genital Diseases,* which detailed swine reproductive diseases which were known by 1991 to grow on simian cells. Tr. at 5.24–5.25. Dr. Rowland said that if one were to have "hit the books" to learn how to grow PRRS, one would have reviewed these articles and

books. Tr. at 5.28. In light of these references Dr. Rowland opined that the reason investigators had trouble solving the PRRS problem was that there was a lack of money or lack of interest dedicated to PRRS research prior to 1990 and because the disease displayed so many different symptoms it was difficult for investigators to understand the disease. Tr. at 5.25.

Dr. Rowland testified with respect to the claim description that the fact that the viral agent was recovered from three herds would not necessarily mean that more than the VR–2332 strain was involved. Tr. at 5.31. He explained that he based this opinion on the fact that the claim paragraph did not specify that anything other than VR–2332 was recovered, so he concluded that nothing else was recovered. Tr. at 5.31. He said that the fact that three herds were used to obtain isolates did not change his mind because if the herds were geographically close to each other, they may have been infected with the same virus. Tr. at 5.31. Dr. Rowland said that even if the specification made clear that the herds were on different farms, he still would not conclude that anything other than VR–2332 was recovered because it was not specified in the paragraph. Tr. at 5.32. He further testified that the nomenclature of virology at the time of the hearing, "strain" is used to describe isolates that are different, and isolates are not considered different isolates even if they are taken from several homogenates taken from a single pig. Tr. at 5.33. Therefore, he concluded that the claim description did not indicate that Boehringer was in possession of any strain of PRRS other than VR–2332. Tr. at 5.33–5.34.

Moreover, Dr. Rowland considered column 3 of the '563 Patent, lines 21 through 28 which defines "infectious agent" and concluded that the description does not demonstrate that the inventors had in fact, isolated any other strain of the virus other than VR–2332. Tr. at 5.34. He proffered

this same conclusion with respect to lines 34 and 35 of column 3, lines 1 through 7 of column 2, lines 27 and 28 of column 2, line 19 of column 6, line 1 through 6 of column 9, column 9 line 27, column 10 lines 58 and 59, column 11, and column 12 line 56. Tr. at 5.34–5.37. Dr. Rowland testified that no strain other than VR–2332 was mentioned in the patent and there is nothing in the material that would convey to one skilled in the art that the patent related to anything other than VR–2332. Tr. at 5.37. Dr. Rowland testified further that Dr. Murtaugh's reliance on column 8, starting at line 52 which refers to recovery of the viral agent after culturing, was misplaced because that passage does not indicate that anything other than VR–2332 was recovered. Tr. at 5.38.

On cross-examination, Dr. Rowland admitted that he had never heard of PRRS until 1992, after its cause was discovered and prior to 1991, he had not cultured any significant veterinary viruses. Tr. at 5.41. With respect to his testimony regarding the virus being extracted from three herds, Dr. Rowland said that it is not his testimony that a person of ordinary skill would think that exactly the same form of PRRS had been taken from the three herds as VR–2332. Tr. at 5.42. Dr. Rowland, however, conceded that it would have been reasonable for a person of ordinary skill to conclude based upon all of the information in column 8, that the recovery method used on the virus derived from the three herds was the same recovery method that was used to get VR–2332 in the first instance. Tr. at 5.45–5.46. He agreed that, in fact, no other cell other than simian cells was disclosed anywhere in the '563 Patent capable of growing PRRS such that one could reasonably infer that simian cell technology was used to recover the viruses from the three herds. Tr. at 5.46. Dr. Rowland further conceded that the definition of "infectious agent" contained in the '563 Patent was broad enough to include any agent causing PRRS and therefore, that the use of "infectious agent" rather than reference to VR–2332 in the

"Detailed Description of the Invention," would imply that any virus capable of causing PRRS was within this definition and that the invention was not restricted to VR–2332. Tr. at 5.46–5.48.

In addition, although on direct examination Dr. Rowland testified that column 6, lines 19 through 22 does not support a conclusion that the '563 Patent includes more than VR–2332, on cross-examination he admitted that those lines support a conclusion that the inventors did not intend to limit the patent to their specific examples. Tr. at 5.49. He also admitted that lines 1 through 6 in column 9, previously discounted by him in his direct testimony, tells a person of ordinary skill that VR–2332 is but an example of the virus causing PRRS. Tr. at 4.49–4.50.

With respect to the issue of obviousness, on cross-examination Dr. Rowland conceded that he found only two references to porcine viruses being grown on MA–104 cells prior to 1991 and that, indeed, those articles would not have given a person of ordinary skill in the art a reasonable expectation that the PRRS virus would grow on MA–104 cells in 1991. Tr. at 5.53. With respect to the articles Dr. Rowland referred to in his expert report, Schering Exh. 25 through 39, which report the growth of certain porcine viruses on simian cells, Dr. Rowland admitted that only one of those articles, Schering Exhibit 29, referred to a swine virus being grown on MA–104 cells. Tr. at 5.53–5.54.

Dr. Rowland testified that several of the viruses listed in Schering's Exhibits 7 through 24 and 41 have both respiratory and reproductive symptoms. Tr. at 5.56–557. With respect to swine influenza, however, Dr. Rowland said that influenzas in general are "known to cross the placental barrier and infect the fetus, so they have been implicated in some reproductive disorders," but ultimately deferred to Boehringer's expert, Dr. Easterday, and his opinion that swine influenza has not conclusively been shown to have a reproduc-

tive component. Tr. at 5.57. Dr. Rowland said that psuedorabies, African swine fever, porcine enterovirus and reoviruses each have both respiratory and reproductive symptoms but prior to January 1991 nobody skilled in the art would have confused the symptoms caused by those viruses with PRRS. Tr. at 5.57–5.58. He also acknowledged that even looking at the complete set of literature attached to his expert report, Schering Exhibits 7 through 39, would not have pointed a person of ordinary skill in 1991 to use simian cells exclusively to grow the PRRS virus. Tr. at 5.58. Dr. Rowland further testified that the art at the time taught that if one included simian cells in their array, one would have a reasonable probability that the array would work but that one would not have a "specific probability" that the simian cells would "be more apt to be successful ... than the other cells in your array." Tr. at 5.64.

With respect to Dr. Collins' abstract referring to his homogenate work, Pl. Exh. 29, Dr. Rowland agreed that Dr. Collins did not reach a conclusion that he had a virus in his homogenate. TR. at 5.59. Dr. Rowland said that after he reviewed Dr. Collins article, he concluded with 90% certainty that what Dr. Collins had was a virus, but that there was a chance that it was not a virus. Tr. at 5.59.

Harry Manbeck, former General Patent Counsel for General Electric, former United States Commissioner of Patents and Trademarks, and Assistant Secretary of Commerce, testified as an expert in patent law, the United States Patent Office and its procedures. With respect to Claim 3 of the '563 Patent, Mr. Manbeck testified that Claim 3 does not appear in the '563 Patent as it does on Boehringer's Exhibit 1. Tr. at 5.78. He testified that in a independent and dependent claim situation, if a patent examiner finds the independent claim patentable, he will "allow a reasonable number of dependent claims without consideration of whether they actually add further patentability." Tr. at 5.80–5.81. Mr. Manbeck testified that this means that in authorizing the broader claim, the examiner may not have focused on the dependent claims. Tr. at 5.81.

On the issue of disclosure to the Patent Office, Mr. Manbeck testified that the process of full disclosure to the Patent Office is necessary since the patent procedure is an ex parte procedure. Tr. at 5.82–5.83. He re-iterated that the Patent Office's only access to prior art is its own discovery and the information provided by the applicant. Tr. at 5.82–5.83. Mr. Manbeck explained, however, that an examiner's ability to discover prior art for himself is limited by the technological limitations of the Patent Office and the fact that technical publications are not classified for the examiner's benefit. Tr. at 5.84–5.85. The examiner also only dedicates 15 to 17 hours to each patent and therefore, relies heavily on the information provided by the applicant. Tr. at 5.88–5.89.

Mr. Manbeck explained that rules of the Patent Office require a duty of candor and good faith and a subset of that duty is the duty of disclosure. Tr. at 5.89. He testified that he had considerable input in changing the standard for disclosure contained in 37 C.F.R. § 1.56 which was changed to make the standard of materiality under the rule "more precise." Tr. at 5.90–5.91. He said that the change in 1992 was not meant as a substantive change to the standard for disclosure and that, in fact, the application of both the old and new rule should result in the same conclusion. Tr. at 5.91. Mr. Manbeck explained that the old rule defined materiality as a "substantial likelihood that a reasonable examiner would consider the reference important in deciding whether or not to issue claims in patent cases." Tr. at 5.92. The new rule, promulgated in 1992, defines materiality in terms of whether a reference "if by itself or taken together with other references, would create a prima facie case of unpatentability." Tr. at 5.93. In addition, the inquiry is whether the "reference would be inconsistent with an argument

being made for patentability by the applicant or would be inconsistent with the position he was taking in opposition to the examiner's position." Tr. at 5.93.

Mr. Manbeck opined that after the parties were before this Court in the '778 litigation, Boehringer was required to tell the examiner all material information from those proceedings. Tr. at 5.96. He also explained that all examiners attend a Patent Academy and learn the applicable law and regulations and are all very experienced. Tr. at 5.95. Mr. Manbeck further explained that MPEP section 2001.06(c) provides that "[w]here the subject matter for which a patent is being sought or has been involved in litigation, the existence of such litigation and any other material information arising there from must be brought to the attention of the Patent and Trademark Office." Examples of such material information include evidence of possible prior public uses or sales, questions of inventorship, prior art, allegations of 'fraud,' 'inequitable conduct,' and 'violation of duty of disclosure.' Tr. at 5.97–5.98. Mr. Manbeck provided another example of such material as any assertion made during the litigation which is "contradictory to assertions made to the examiner. Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions and other documents and testimony." Tr. at 5.98. Mr. Manbeck qualified this testimony with the fact that this is not a statutory obligation but rather advice from the Patent Office to attorneys. Tr. at 5.99. He also said that a failure to disclose such information without intent is not "inequitable conduct," but such conduct with the requisite intent is "inequitable conduct." Tr. at 5.100. He testified that the negligent failure to disclose material information to the examiner could also result in the invalidity of that patent if a Court finds that had the examiner had that information, the patent would not have been issued. Tr. at 5.100–5.101.

After reviewing further MPEP section 2001.06, Mr. Manbeck concluded that Boehringer should have provided the Patent Office with information about this Court's previous opinion in the '778 Patent litigation. Tr. at 5.103. He added that even if Boehringer engaged in inequitable conduct, i.e., failure to disclose with the requisite intent, but a jury concludes that the undisclosed material would not have made the invention obvious, the Court must still consider whether there was inequitable conduct invalidating the patent. Tr. at 5.109. Mr. Manbeck also said that inequitable conduct in the prosecution of the '778 Patent could not be cured by full disclosure in the prosecution of the '563 Patent, and in fact, under the doctrine of "fruit of the poisoned tree," once there is "inequitable conduct in the prosecution of one patent, it will render related patents also unenforceable." Tr. at 5.112.

Mr. Manbeck also testified that there is nothing in the '778 Patent to inform the examiner that the homogenate work was conducted by anyone other than the claimed inventors of the '778 Patent. Tr. at 5.115. Though Mr. Manbeck is not an expert in virology, he opined that it would have been important for the examiner to know that the homogenate work referred to under "The Invention" section of the '778 Patent was the work of Drs. Collins and Benfield and not the claimed inventors. Tr. at 5.120. Mr. Manbeck based this opinion on the conclusion that the Examiner would have wanted to know that the inventors started with a virus known to cause PRRS. Tr. at 5.121. He also said that there is no question that Drs. Collins and Benfield's work qualifies as prior art under section 102(g). Tr. at 5.120. He then opined that had this information been known to the Examiner, a "reasonable examiner would have said, all right, the inventors had a homogenate with the virus in it and nothing but the virus, and they applied to it a known technique that had already been used to assess viruses, ... he would have said it would have been obvious to apply it to this one." Tr.

at 5.122. Mr. Manbeck said that had Boehringer had told the examiner that Drs. Collins and Benfield performed the homogenate work but that that work was insignificant, the examiner would have conducted his own review of the prior art. Tr. at 5.124.

Mr. Manbeck disagreed with Mr. Gould's testimony that Boehringer had no obligation to identify the starting point of the invention as long as the invention is limited to Boehringer's work. Tr. at 5.124. Mr. Manbeck further opined that Boehringer's inclusion of Drs. Collins and Benfield's work in "The Invention" section as not an omission of prior art but a misrepresentation. Tr. at 5.125. He based his opinion on Ms. Devlin's deposition testimony where she said that she did not highlight this information for the examiner but left it in "The Invention" section. Tr. at 5.126.

With respect to Boehringer's alleged oral disclosure of the '778 Patent litigation to the examiner, Mr. Manbeck said that all dealings with the Patent Office are to be in writing and when oral communications are engaged in, they are to be recorded later. Tr. at 5.127. On this point, Mr. Manbeck relied upon MPEP section 2002.02. Tr. at 5.127. He also said that there is no indication in the '778 Patent file that the examiner considered the Drs. Dea and Van Alstine articles prior to issuing that patent. Tr. at 5.128. He opined that if those articles had been given to the examiner as well as the true origins of the homogenate work, the examiner could and would have rejected the patent as obvious to use a simian line to grow PRRS. Tr. at 5.129

With respect to the '563 Patent, Mr. Manbeck testified that the reference to "According to the present invention," in column 2, line 13 of that patent accurately reflected the fact that Drs. Collins and Benfield were included as inventors of the '563 Patent. Tr. at 5.134. Mr. Manbeck said that despite the fact that Drs. Collins and Benfield were later removed by Boehringer as coinventors of the '563

Patent, Boehringer never informed the patent Office that Drs. Collins and Benfield's work must then be excluded from "The Invention" section and be added as prior art to the invention. Tr. at 5.134. Mr. Manbeck opined that Boehringer should have made this clear to the examiner. Tr. at 5.135. He also opined that the examiner considering the '563 Patent should have been advised of Ms. Devlin's testimony regarding the disclosure of Drs. Collins and Benfield's work as it related to the '778 Patent so that the examiner would know that it had been "deliberately withheld from him during the '778 [prosecution], and he could make an evaluation in view of that as to how important the withheld information really was." Tr. at 5.138–5.139

Mr. Manbeck said that Boehringer complied literally with Rule 56 given the fact that the examiner checked-off all of the articles attached to Boehringer's application, but that Boehringer did not comply with MPEP section 2000.4, note 13 which suggests that the applicant highlight the important documents to be reviewed when a long list of documents is submitted to the examiner. Tr. at 5.140. Mr. Manbeck said that the duty to disclose continues throughout the prosecution process such that after the importance of the Drs. Dea and Van Alstine articles was made known to Boehringer, Boehringer had an obligation to "highlight" those articles for the '563 examiner. Tr. at 5.141. He also said that the expert reports filed in the '778 Patent litigation fell "squarely within the guideline of what should be submitted from related litigation" to the '563 examiner. Tr. at 5.141.

Mr. Manbeck further opined that Boehringer's failure to describe Drs. Collins and Benfield's work as prior art violated the duty that "[c]are should be taken to see that prior art or other information cited in a specification or in an information disclosure statement is properly described and that the information is not incorrectly or incompletely characterized." Tr. at

5.143. He said that "[i]nformation [from a companion litigation] bearing on patentability from a related litigation certainly should be submitted, and the guidelines made it clear that information bearing on possible inequitable conduct should also be submitted." Tr. at 5.143–5.144. Again, Mr. Manbeck testified that material information should be submitted to the examiner for consideration and cited MPEP section 2000.4, note 10, which states "the question of relevancy in close cases, should be left to the examiner and not the applicant." Tr. at 5.146.

On cross-examination, Mr. Manbeck testified that the examiner in both the '563 and '778 Patents prosecutions conducted computer database searches but he could not say how much time the examiner spent on the patent applications in this case. Tr. at 5.149–5.150. He said that the pre–1992 standard for inequitable conduct was argued by some to be imprecise and difficult to comply with, and that in fact, he was of the opinion that the old rule was leading to unjustifiable charges of inequitable conduct. Tr. at 5.151–5.152. He agreed that the filing date of the '563 Patent occurred before the new rule was put into effect. Tr. at 5.154. Mr. Manbeck acknowledged that the examiner did not request additional information with respect to the '563 Patent and that despite Schering's defensive argument, neither Drs. Steece nor Rowland testified that any portion of the Court's preliminary injunction decision or any of the pleadings in the '778 Patent contained material information to the prosecution of the '563 Patent. Tr. at 5.157–5.158. He also clarified that he never testified that it was not normal practice to provide briefs to the examiner in a related patent prosecution, rather he said that relevant information from litigation should be submitted to the patent office. Tr. at 5.159. When shown Schering's Patent 5,866,401, issued in February 1999, relating to Schering's PRRS vaccine which does not reference Schering's expert, Dr. Murtaugh's, expert report which compared Schering's patent to Boehringer's patent,

Mr. Manbeck said that he simply did not know whether Schering was obligated to disclose the report to the Patent Office. Tr. at 5.167.

Mr. Manbeck acknowledged that one of Dr. Collins's abstracts which disclosed some of Drs. Collins's and Benfield's homogenate work was disclosed to the examiner reviewing the '778 Patent and in fact, the examiner indicated on the information disclosure statement that he reviewed this abstract. Tr. at 6.18. He also acknowledged that Examiner Caputo, the Examiner named in the '778 Patent, indicated that he reviewed the Dr. Collins abstract in connection with the Drs. Collins and Benfield case, that on the same day Examiner Preston also initialed his consideration of the Dr. Collins abstract with respect to the '778 Patent, and both Examiners Preston and Moskowitz worked on the Drs. Collins and Benfield application which disclosed their homogenate work. Tr. at 6.27–6.28. Mr. Manbeck, however, maintained that "there is nothing in the record to indicate that the examiners who issued the patent knew of the Drs. Collins and Benfield abstract." Tr. at 6.28. He acknowledged, of course, that the Drs. Collins and Benfield abstract was disclosed by Boehringer to the Patent Office in connection with the '563 Patent. Tr. at 6.28–6.29. Mr. Manbeck further opined that affirmative misrepresentations are material and may form the basis of a finding of inequitable conduct regardless of whether the reference which was misrepresented was material to the patent application. Tr. at 6.33. He recognized, however, that he did not allege an affirmative misrepresentation with respect to the Drs. Dea and Van Alstine articles. Tr. at 6.34. He further acknowledged that if the Court found that the Drs. Dea and Van Alstine articles were not material, they could not be the basis for a finding of inequitable conduct. Tr. at 6.37. Moreover, he recognized that if those references are merely cumulative as to what was already before the Patent Office, they are not material for purposes

of an inequitable conduct inquiry. Tr. at 6.37. He based his opinion that these articles are not cumulative exclusively on Drs. Steece and Rowland's opinions though he never read their deposition transcripts and at the hearing never heard them say that they had reviewed all of the prior art that was before the examiners. Tr. at 6.35–6.38.

On re-direct, Mr. Manbeck testified that prior art is only classified as such if it is "published more than a year before the patent application was filed." Tr. at 6.42. He testified that the Dr. Collins abstract published in November 1990 was not prior art for Drs. Collins and Benfield's application for their own patent which was filed in September 1991. Tr. at 6.42. Moreover, he testified that the Manual of Patent Examining Procedures warns applicants not to "assume that an examiner will necessarily remember, when examining a particular application, other applications which the examiner is examining or has examined," rather an applicant should "call such applications to the attention of the examiner even if there is only a question that they might be 'material to patentability' of the application the examiner is considering." Tr. at 6.43–6.44. He also testified that there is no indication in the record that the examiner cited Drs. Collins and Benfield's work with respect to the '778 Patent. Tr. at 6.47.

Mr. Manbeck said that based upon Drs. Steece and Rowland's opinions on the materiality of the Drs. Dea, Van Alstine and Drs. Collins and Benfield references, a reasonable examiner would have rejected the '778 Patent for obviousness. Tr. at 6.52. Mr. Manbeck also clarified that with respect to Schering's porcine vaccine, it did cite the Patent Office to Boehringer's '778 Patent.

## IV. *Standard for a Preliminary Injunction in a Patent Case*

■ By its terms, 35 U.S.C. § 283 makes the grant of an injunction discretionary. *See* 35 U.S.C. § 283. To obtain a preliminary injunction in a patent infringement action, a party must establish four factors:

1. a reasonable likelihood of success on the merits

2. an irreparable harm

3. the balance of hardships tipping in its favor; and

4. a tolerable effect on the public interest.

*Sofamor Danek Group v. DePuy–Motech,* 74 F.3d 1216, 1219 (Fed.Cir.1996); *Novo Nordisk A/S v. Becton Dickinson and Co.,* 997 F.Supp. 459, 464–65 (S.D.N.Y.1998). The court "must balance these factors against one another and against the extent of the relief sought." *Sofamor,* 74 F.3d at 1219. The movant bears the burden of proving entitlement to relief. *Id.* However, irrespective of how the court resolves the third and fourth factors, the movant must demonstrate the existence of the first two before the court can grant a motion for a preliminary injunction. *See Reebok Int'l v. J. Baker, Inc.,* 32 F.3d 1552, 1556 (Fed.Cir.1994). The court may deny the motion based upon a plaintiff's failure to establish either of the first two factors. *See Id.* Moreover, where the plaintiff has not established either of the first two factors, the court need not articulate findings regarding the others. *Id.*

## A. Reasonable Likelihood of Success

■ At the preliminary injunction stage, a patentee must establish a likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement. *See Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir.1991). Here, Schering has conceded infringement for the sake of this preliminary injunction motion. Def. Crit. Find. Fact No. 60. A preliminary injunction does not issue, however, merely because infringement of a patent is not at issue. Rather, since only a valid patent may be infringed, the first inquiry in this context is to determine whether Boehringer's patent is invalid.

Although a patent is presumed to be valid once it issues from the Patent Office and the alleged infringer must prove invalidity by clear and convincing evidence, *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 722–23 (Fed.Cir.1990), in the preliminary injunction context, the plaintiff bears the burden of proving that each of the alleged infringer's defenses to that patent lacks "substantial merit." *New England Braiding Co., Inc. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed.Cir.1992); *see also M & R Marking Systems, Inc. v. Top Stamp, Inc.*, 926 F.Supp. 466 (D.N.J.1996); *Novo Nordisk A/S*, 997 F.Supp. at 466. Thus, absent a showing by Boehringer that Schering's defenses lack substantial merit, its motion for preliminary injunction must be denied. Therefore, even assuming as I do that Schering's vaccine infringes directly on the '563 Patent, I must address the merits of Schering's defenses to the Patent.

As discussed above, Schering claims that the Patent is invalid because of obviousness under 35 U.S.C. § 103, inequitable conduct, and violations of the "written description" requirement of 35 U.S.C. § 112. In response to these asserted defenses, Boehringer argues that the growth of PRRS on MA–104 cells was not obvious based on the prior art, that it did not engage in inequitable conduct in either failing to disclose the prior art to the Examiner of the '563 Patent or failing to produce to the Examiner pleadings and other documents from the '778 Patent litigation, and that it fully complied with the "written description" requirement of 35 U.S.C. § 112. I will discuss these defenses below.

### 1. *Obviousness*

Section 103(a) provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the sub-ject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a) (hereinafter "section 103"). Therefore, the first inquiry for this Court is whether Boehringer's invention, *i.e.*, the growth of PRRS on MA–104 cells, was even patentable under section 103(a). The question of obviousness under section 103 is a question of law that is reviewed on appeal de novo, *In re Donaldson Co.*, 16 F.3d 1189, 1192 (Fed.Cir.1994) (in banc), although the factual determinations which underlie an obviousness decision are questions of fact reviewed under the clearly erroneous standard. *In re Beattie*, 974 F.2d 1309, 1311 (Fed.Cir.1992).

As stated above, although Boehringer's patent enjoys a presumption of validity and generally Schering must establish obviousness by clear and convincing evidence, *Litton Systems v. Honeywell*, 87 F.3d 1559, 1566 (Fed.Cir.1996), in the context of a preliminary injunction, the burden shifts back to Boehringer which is burdened with the prospect of showing a reasonable likelihood of success on the merits. Therefore, the patent holder in a preliminary injunction context must demonstrate that "in light of the presumptions and burdens that will inhere at trial on the merits, ... its infringement claim will likely withstand [the defendant's] challenge to the validity ... of the ... patent." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed.Cir.1997). Therefore, this Court must consider whether Boehringer has succeeded in defeating Schering's obviousness challenge by showing that it lacks "substantial merit."

■ This Court has already recognized that "[g]iven the stakes involved in the determination of the prior art issue, it is crucial that the section 103 analysis be applied with circumspection." *Boehringer I*, 984 F.Supp. at 254. The Court must look at the whole invention rather than merely its different elements, *Gillette Co.*,

919 F.2d at 724, and must "step backward in time and into the shoes worn by a person of ordinary skill in the art when the invention was unknown and just before it was made." *In re Fine*, 837 F.2d 1071, 1074 (Fed.Cir.1988). In this respect, the parties agree that the relevant period of inquiry is April 1991, when Dr. Harris first grew the PRRS virus on MA–104 cells.

It is also axiomatic that when conducting a section 103 analysis, the evidence must be viewed from the position of a person of ordinary skill, not from the position of an expert. *Litton Systems, Inc.*, 87 F.3d at 1566–67; *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.1988). In addition, the Court is prohibited from relying on the perfect vision of hindsight and must be ever mindful that "[o]ne cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." *In re Fine*, 837 F.2d at 1074. Moreover, the prior art must be reviewed in isolation unless a combination is taught or suggested by the prior art because although obviousness is tested by "what the combined teachings of the references would have suggested to those of ordinary skill in the art," *In re Keller*, 642 F.2d 413, 425 (Cust. & Pat.App. 1981), it "cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination." *ACS Hosp. Sys., Inc., v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984).

Within this background, the question of obviousness under section 103 is ultimately a question of law which involves four factual inquiries:

(1) the level of ordinary skill in the pertinent art; and

(2) the scope and content of the prior art; and

(3) the differences between the claims and the prior art; and

(4) secondary considerations, if any, of nonobviousness.

*See B.F. Goodrich Company v. Aircraft Braking Systems Corp.*, 72 F.3d 1577, 1582 (Fed.Cir.1996). Secondary considerations include "evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others." *Id.*

To fully comprehend Schering's obviousness arguments and analyze their merit, it is essential that I first separate the arguments from one another so that they may each stand on their own under this Court's scrutiny. First, Schering argues that two articles, one published by Dr. Dea and one published by Dr. Van Alstine in 1990 taught the use of MA–104 cells for the growth of porcine viruses. Second, Schering argues that an article published by Dr. Goldstein in 1970 regarding the growth of the swine influenza virus is material prior art which establishes the obviousness of Boehringer's invention. Third, Schering claims that growing viruses on MA–104 cells was well-known such that Boehringer's use of this technique was obvious.[7] For the reasons set forth below, Schering has raised a substantial defense that the Drs. Dea and Van Alstine references suggested and taught the use of MA–104 cells to grow the PRRS virus.

*a. Level of Ordinary Skill in the Pertinent Art*

In the instant case, the pertinent art is veterinary virology and the level of ordinary skill is a bachelor's degree in microbiology or biology with several years of

---

7. Schering also argues that prior and contemporaneous experiments by Drs. Ohlinger, Meetz, McGinley, Hesse and Nelson support its obviousness defense. Def.'s Find. of Fact No. 10–14. Schering, however, acknowledges that this is "technically not prior art," and agrees that the work of these scientists is probative of a secondary indicia of obviousness. Def. Crit. Find. Fact No. 9. Therefore, it will be considered below.

experience. Pl. Concl. Law No. 9; Def. Crit. Concl. Law No. 9.

### b. Scope and Content of Prior Art

Boehringer and Schering both seem to agree that the general scope and content of the prior art is consistent with this Court's previous ruling that in April 1991 virologists knew that viruses could "be grown by inoculating a sample of the virus onto either a full or partial sheet of cells and then incubating the virus and looking for the presence of CPE," *Boehringer I,* 984 F.Supp. at 255. Schering interprets this statement, however, with talismanic impact claiming that the only consideration left for this Court is whether it was obvious to grow PRRS on MA–104 cells. Def. Find. Fact. 15. Boehringer, on the other hand, interprets this statement as merely a description of a testing procedure which is predicated by several determinations such as whether a known or unknown virus is responsible for the disease, whether the disease can be grown on homologous cells and that only after homologous cells fails would a virologist in 1991 attempt to grow the disease on another species' cell line and at that point it would be "trial and error" without any "expectation that any culture system in particular would work." Pl. Find. Fact No. 12.

As with most hard-fought disputes between two very capable parties, the truth lies somewhere in between the parties' respective positions. Here, Schering is correct to rely on the above-quoted statement from *Boehringer I* as to *how* viruses were isolated in 1991 and is also correct that the ultimate question to be resolved by this Court is whether Schering has presented a defense of obviousness to defeat Boehringer's patent. What Schering omitted from its characterization of the content and scope of the state of the art is what Boehringer has correctly identified— the *process* a virologist would have employed in 1991 to isolate and grow the PRRS virus and the decision-making process a virologist would have used to deter-

mine what cells to use to grow the PRRS virus. It is essential to this Court's determination of the ultimate question—whether it was obvious to use MA–104 cells to grow PRRS—what process an ordinarily skilled virologist in 1991 would have employed to grow the PRRS virus once they had received the homogenate they believed contained PRRS. Indeed, in *Boehringer I* this Court found that "[c]hoosing a cell line is perhaps the most challenging task faced by virologists," and [s]uccess in growing a virus is critically dependent on choosing the right cell line, but whether a particular virus will grow on a given cell and under what conditions remains uncertain and unknown. *Boehringer I,* 984 F.Supp. at 255.

Thus, the issue of obviousness must be considered with an understanding of how an ordinary person skilled in the art would go about isolating and growing this unknown porcine virus in 1991. This, of course, includes an understanding of how a given cell line is selected for growth of a virus and what factors contribute to such a determination. Before I reach the merits of Schering's obviousness arguments, I will briefly summarize the parties' respective positions.

Schering first argues that the prior art suggested the inclusion of MA–104 cells in a test array because "[i]n addition to the swine influenza art referred to at the earlier hearing, the scope and content of the prior art also includes the fact that prior to 1991, simian cells were known to be the most permissive cell lines for growth of animal viruses." Def. Find. Fact. No. 16. Schering further argues that the fact that porcine viruses such as "swine influenza, pseudorabies, African swine fever virus, porcine enterovirus, swine vesicular disease virus, vesicular stomatitis virus, vesicular exanthema, porcine rotavirus, porcine reovirus, encephalomycarditis virus (EMC), porcine epidemic diarrhea virus and Japanese B encephalitis virus" were known in 1991 to grow on simian cells, and the fact that some of these viruses have both respiratory and reproductive compo-

nents provided "additional motivation to one skilled in the art to include simian cells in their array when seeking to cultivate PRRS." Def. Find. Fact. No. 16–17. Schering further argues that this prior art was very instructive because some of these viruses, which were known to grow on simian cell lines, were still thought to be the possible cause of PRRS in 1991.

In response, Boehringer argues that the prior art did not teach the inclusion of MA–104 cells to grow an unknown porcine virus in 1991 which had both respiratory and reproductive symptoms. Boehringer further argues that the prior art had eliminated certain causative agents which led investigators away from the references relied upon by Schering. Boehringer also argues that "permissiveness" is not relevant or determinative of the obviousness inquiry. In addition, Boehringer counters Schering's obviousness argument with the fact that Schering's evidence falls short of proving that one would have a reasonable likelihood of success growing PRRS on MA–104 cells but merely that the prior art, at best, only taught that MA–104 cells were "obvious to try" which is not the applicable legal standard in this inquiry.

Next Schering argues that obviousness is established by the article written by Dr. Dea which was included in the 1990 L.C.I. Conference Proceedings, Pl. Exh. 26, which specifically suggests "the use of Vero cells (simian cells) as one of the cell lines of choice for attempting virus isolation from herds which were experiencing outbreaks of respiratory and reproductive problems which had been associated with the Mystery Swine Disease." Def. Find. Fact No. 21; see also Def. Find. Fact No. 25. Schering further relies on article included in the same packet of material written by Dr. Van Alstine which Schering claims "suggests a small battery of cell lines, with MA–104 as one of the specific lines of choice, for attempting isolation of Mystery Swine Disease." Id. Boehringer counters that both of the articles taught away the use of MA–104 cells because both

Drs. Dea and Van Alstine failed to grow PRRS on their arrays which included Vero cells and MA–104 cells, respectively. Pl.'s Crit. No. 21.

Finally, Schering argues that an article published by Dr. Goldstein in 1970 regarding the growth of the swine influenza virus on simian cells also made the use of simian cells obvious in the search for the causative agent of PRRS. Schering argues that the similarities in the symptomology between swine influenza and PRRS would have led one skilled in the art to consult literature discussing the growth of swine influenza and would have been instructive as to the use of simian cells. See Def. Crit. Find. Fact 28–31. Boehringer counters that PRRS is symptomologically distinct from swine influenza such that one skilled in the art would not have consulted Dr. Goldstein's work. Boehringer also argues that since Dr. Goldstein did not use MA–104 cells in his research, the usefulness of his work is limited and that Dr. Goldstein's conclusion that simian cells were the least desirable culture system taught-away the use of simian cells. See Pl. Find. Fact No. 27–32. Boehringer also argues that the Patent Office considered the Dr. Goldstein reference in reviewing the '563 Patent and did not conclude that the Dr. Goldstein reference rendered the Patent obvious. See Pl. Find. Fact No. 32.

### c. the differences between the claims and the prior art

In the instant case, the Court must consider whether, in light of the prior art at the time, a person of ordinary skill in the art would have reasonably expected that the PRRS virus could be isolated on MA–104 cells.

I start with the conclusions already articulated in *Boehringer I* regarding the state of the art in 1991: a virologist skilled in the art would first attempt to grow an unknown porcine virus on porcine cells; that an unknown virus "should be inoculated on a plurality of cell lines;" and that cell lines from other species may be utilized in

this endeavor. *Boehringer I,* 984 F.Supp. at 256. This, however, merely informs us that an unknown virus should be inoculated on a plurality of cell lines but it does not answer the ultimate question of whether it was obvious that one should employ MA–104 cells in this enterprise.

Before reaching this issue, I must first, again, dispose of Schering's persistent argument that this issue should be decided under an "obvious-to-try" inquiry. Essentially, as in *Boehringer I,* Schering argues that the prior art taught that MA–104 cells should be included in an array used to try to isolate the PRRS virus. Schering argues that even if the success of MA–104 cells over other cells in the array were not known or guaranteed, if it were obvious to include MA–104 cells within such a test array, the invention is obvious. Schering's argument, however, amounts to a request that "obvious-to-try" MA–104 cells should control the obviousness inquiry. I have already rejected this argument in *Boehringer I* and I reject it again here.

The caselaw in unambiguous that an invention is not unpatentable merely because it was "obvious to try." *See In re Deuel,* 51 F.3d 1552, 1559 (Fed.Cir.1995); *Gillette Co.,* 919 F.2d at 725. An invention is merely "obvious to try" when the results suggested by the prior art do not create a reasonable expectation of success. *Gillette Co.,* 919 F.2d at 725. In the "obvious to try" situation, the "prior art gives either no indication of which parameters are critical or no direction as to which of many possible choices is likely to be successful." *Merck & Co., Inc. v. Biocraft Laboratories, Inc.,* 874 F.2d 804, 807 (Fed.Cir.1989) (relying on *In re O'Farrell,* 853 F.2d 894, 903 (Fed.Cir.1988)).

Here, the issue of whether the growth of PRRS on MA–104 cells was "obvious" or just "obvious to try" is complicated by the fact that in virology one does not attempt to isolate a virus on a single cell line, but rather one employs an array containing several cell lines. Based upon this practice, Schering urges this Court to find that

"considering the methodology commonly employed by those skilled in the prior art (*i.e.,* utilizing a small array of cells with the expectation that one or more would support the virus), the Court finds a 'reasonable expectation of success' in this technology refers to the reasonable expectation that one or more of the cells included in the array would produce the desired growth, and not necessarily that any specific one would be the particular one upon which the virus would grow." Def. Find. No. 25. Indeed Schering basically argues that this Court has invited an "obvious to try" standard by holding that "[t]here is no question that the prior art teaches that 'one could attempt to isolate viruses from a mammalian tissue homogenate by inoculating a plurality of cell lines from different species,' but based upon that, alone, it was not obvious to combine the conventional methodology and *to try a battery of cell lines, among with included MA–104.*" Def. Post Hear. Br., at pp. 7–8 (*quoting Boehringer I,* 984 F.Supp. at 256) (emphasis added).

Boehringer objects to this suggestion and asks this Court to apply the traditional definition of obviousness, *i.e.,* a reasonable expectation of success, to MA–104 cells in particular rather than its test array because even if it were obvious to include MA–104 cells within a test array, without a reasonable expectation that MA–104 cells would successfully grow the PRRS virus, the invention is not obvious.

It is abundantly clear to this Court that Boehringer has the better of the argument. Schering's attempt to broaden the issue notwithstanding, the fact that virologists often try at one sitting several different cells does not alter the legal standard applicable to this case. As in all patent cases, the obviousness inquiry is not controlled by an "obvious-to-try" standard, but rather an inquiry into whether the invention was obvious. Schering's reliance on the above-quoted excerpt from *Boehringer I* is erroneous considering this Court's explicit holding in that opinion. In

*Boehringer I*, this Court held that the question in the '778 litigation was "whether, in light of the prior art at the time, one could have reasonably expected that the PRRS virus could be grown and isolated on simian cells, MA–104 ..." *Boehringer I*, 984 F.Supp. at 255. Thus, as in the '778 litigation, the relevant inquiry here is not whether it was obvious to include MA–104 cells within an array, but whether there was a reasonable expectation that PRRS would grow on MA–104 cells in 1991. Schering's argument that the prior art established that it was obvious to include MA–104 cells in an array without a specific expectation as to which cell line would work is synonymous with the prior art giving "no direction as to which of may possible choices is likely to be successful." *Merck & Co., Inc.*, 874 F.2d at 807.

Notwithstanding Schering's persistence in presenting evidence conforming to this erroneous standard [8], the Court's conclusion is readily apparent by looking at the patent in this case. Boehringer patented the use of MA–104 cells, in particular, to isolate the PRRS virus and did not patent a test array to be utilized in diagnosing PRRS in which several cell lines are utilized with the expected result that at least one of the cell lines would render a conclusive result. If such a diagnostic test kit were the invention here, then Schering's argument that it was obvious to include MA–104 in a test array might be more relevant and thus more persuasive. That is not the case here. Rather, Boehringer patented the use of a single cell line—MA–104—and therefore the pertinent inquiry is not whether it was obvious to include MA–104 in the test array but whether it was obvious that MA–104 would work, *i.e.*, was there a reasonable expectation of success with respect to MA–104. Accordingly, in considering Schering's obviousness argument, I will consider whether there was a reasonable expectation in 1991 that MA–104 cells would successfully grow the PRRS virus.

 In applying this standard to the obviousness inquiry, I must also add that while I reject Schering's attempt to interpose an "obvious to try" standard on this inquiry, I also reject Boehringer's implied argument that to succeed on its obviousness defense Schering must prove that the prior art taught the exclusive use of MA–104 cells or that MA–104 cells had a greater likelihood of success than other cells. Just as Schering has repeated offered its "obvious to try" argument to this Court, Boehringer repeatedly elicited testimony that the prior art did not teach the use of MA–104 cells to the exclusion of all other cells and that the prior art did not teach that MA–104 cells had a better chance of success than the other cells in the array. *See* Pl. Br. at pp. 20–21 (Boehringer relies on Dr. Rowland's testimony that the literature would not "provide an incentive to exclusively use MA–104s and expect them to support the growth of PRRS virus"); Tr. at 4.52 (on cross-examination, Schering's expert Dr. Steece stated that he could not say that simian cells would work to the "exclusion of all others."); Tr. at 5.58 (on cross-examination Dr. Rowland states that Def. Exhs. 7–39 would not have pointed a person of ordinary skill in 1991 to use simian cells exclusively to grow the PRRS virus). However, just as "obvious to try" is not the standard, neither is exclusivity or preference because "the fact that a specific [embodiment] is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered." *In re Lamberti*, 545 F.2d 747, 750 (Cust. & Pat.App.1976); *see also In re Geisler*, 116 F.3d 1465 (Fed.Cir.1997) (prior art made patent obvious despite sugges-

---

**8.** *See* Tr. at 3.145 (Dr. Steece opined that one skilled in the art with access to Dr. Dea's article would include a simian line in an array in an attempt to isolate a porcine virus which was causing respiratory and reproduc- tive symptoms; Tr. at 5.64 (Dr. Rowland testified that the art at the time taught that if one included simian cells in their array, one would have a reasonable probability that the array would work).

tion in prior art lading away from patented claim); *Merck & Co., Inc.*, 874 F.2d at 807–08 (holding patent obvious where patent used one combination of 1200 taught in prior art). This rejection of an "exclusivity" standard flows from the Federal Circuit's holding in *Merck & Co., Inc.*, 874 F.2d at 807, that prior art which "disclosed a multitude of effective combinations does not render any particular formulation less obvious."

 Thus, I will consider the remainder of the parties' arguments under the proper legal standard of obviousness without consideration for whether that cell line was either obvious-to-try or should have been used to the exclusion of all other cell lines. To the extent that Schering argues that the prior art taught that MA–104 cells would likely succeed in growing the PRRS virus, I will consider the value of this prior art. *See* Def.'s Crit. Concl. Law No. 13. In this regard, I look to the parties' arguments regarding the Drs. Dea and Van Alstine articles.

The article written by Dr. Dea entitled "Virus Isolations from Farms in Quebec Experiencing Severe Outbreaks of Respiratory and Reproductive Problems," distributed at the L.C.I. Conference in 1990, documented the efforts of Dr. Dea's team to determine the causative agent of PRRS in Canadian herds. Dr. Dea noted that he examined tissues and lesions from a number of infected pigs. He found that a fluorescent antibody examination of the lesions which accompany the disease revealed that tests for "porcine parvovirus (PPV) transmissible gastroenteritis virus (TGEV) and swine influenza virus (SIV) were negative." Pl. Exh. 26 (Dea at p. 68). He further noted that prior to attempting to isolate the virus "nonsignificant antibody titers against TGEV, PPV, SIV, bovine viral diarrhea virus (BVD) and infectious bovine rhinotracheitis virus (IBR) were found in the sera of convalescent pigs or sows." *Id.*

Dr. Dea reported that with the use of Vero cells, encephalomyocarditis virus (EMCV) was isolated from infected tissues from four different herds afflicted with the symptoms of PRRS. *Id.* He further noted that these results were not duplicated on porcine fallopian tube cells, porcine testicle cells or baby hamster kidney cells. *Id.* Dr. Dea also reported that antigens for EMCV were demonstrated "in more than 33% (39/118) of the clinical specimens." *Id.* Dr. Dea further noted that he isolated the influenza virus on embryonating eggs and that the influenza isolate "could be propagated in MDCK [monkey kidney] cells provided trypsin was added to the culture medium." Pl. Exh. 26 (Dea at 70). Dr. Dea concluded that EMCV was detected in the sick herd population but that "experimental inoculation studies were needed to confirm the existence of a pneumotropic EMCV variant [that] may have been associated to outbreaks of respiratory and reproductive problems in Quebec pig farms." Pl. Exh. 26 (Dea at 71).

Dr. Van Alstine's article "Past Diagnostic approaches and Findings and Potentially Useful Diagnostic Strategies," was also distributed and presented at the L.C.I. Mystery Swine Disease meeting in 1990. Dr. Van Alstine reported that he found a three to four fold increase in swine influenza virus (SIV) titers on several farms effected by PRRS. Pl. Exh. 26 (Van Alstine at 55). Dr. Van Alstine further reported that tissues from the diseased herds were tested for several diseases including SIV and EMC and that "in most herds, the same tissues ... were placed on swine testicular cells (ST), dog kidney cells (DK), and baby hamster kidney cells (BHK). In addition three of the eight intensively studied farms had the same tissues placed on porcine and bovine turbinate cells, porcine kidney cells (PK–15), monkey kidney cells (MA104), and feline kidney cells (CRFK)." Pl. Exh. 26 (Van Alstine at 54). He noted that two herds were positive for rotavirus, two were positive for SIV by FA, one herd was positive for SIV by virus isolation and parvovirus was isolated from one herd. Dr. Van Alstine, however, did

not disclose which cell line produced these results. *Id.* In the end, Dr. Van Alstine concluded that, *inter alia,* since swine influenza was detected frequently among infected herds, "swine influenza virus remains as one of the prime suspects for at least one of the causes of Mystery Pig Disease in Wabash County, Indiana." Pl. Exh. 26 (Van Alstine at 58).

The expert testimony discussed in more detail above provided divergent interpretations of the value of these articles. Dr. Easterday testified that neither article would have led one to grow PRRS on MA–104 cells and that, in fact, each of these articles would have steered investigators away from MA–104 cells. Dr. Easterday based this opinion on the fact that Drs. Van Alstine and Dea did not have success growing PRRS on their chosen cell lines such that a person or ordinary skill in the art would not be motivated to duplicate their efforts. He also bolstered his opinion that the use of MA–104 cells was not obvious with the fact that Dr. Van Alstine apparently did not include MA–104 cells within his initial test array but rather added those cells in later attempts to isolate the PRRS virus. Dr. Easterday did, however, concede that in 1991 investigators were looking to swine influenza and pseudorabies as possible causes of PRRS and were using non-porcine cells in their investigations. He also conceded that he knew in 1991 that simian cells were used in the research of porcine viruses.[9]

On Schering's behalf, Dr. Steece, a virologist, pathogenic bacteriologist and industrial microbiologist testified that based upon Dr. Dea's article, one skilled in the art would have included a simian line in an array in an attempt to isolate a porcine virus which was causing both respiratory and reproductive symptoms. He opined that Dr. Dea's article was very exciting because at the time although Dr. Dea only

reported isolating EMC, Dr. Dea thought he had isolated the PRRS virus or that EMC might be a contributing factor to PRRS, such that one attempting to isolate PRRS would certainly attempt to duplicate Dr. Dea's results. With respect to Dr. Van Alstine's article, Dr. Steece also opined that the article was "extremely encouraging" because although Dr. Van Alstine did not isolate the PRRS virus, he had some results isolating a porcine rotavirus. He stated that one reading Dr. Van Alstine's article might conclude that Dr. Van Alstine had isolated PRRS because he isolated swine influenza which Dr. Van Alstine suggested might be a causative agent of PRRS. Dr. Steece, however, could not testify whether prior to the invention date, there was "good serological evidence" that swine influenza was not the causative agent of PRRS. Dr. Steece further opined that one's expectations would be "very high" that one would isolate the PRRS virus in the array used by Dr. Van Alstine because the array contained a number of permissive cells that were known to grow a wide variety of viruses.

Thus, this Court has before it varying expert testimony which on the one hand describes the Drs. Dea and Van Alstine articles as "teaching-away" the use of MA–104 cells and on the other hand expresses the view that these very articles are encouraging and would lead an investigator to duplicate Drs. Dea and Van Alstine's work. In addition to considering the expert testimony, I undertake to review the prior art independently and weigh the expert testimony to resolve this issue. After reviewing these two articles, although it is a close case, given the evidence before the Court and the relief requested by Boehringer, I find substantial merit in Schering's argument that these references did not teach-away the use of MA–104 cells

9. Mr. Gould, an attorney at the law firm of Gibbons, Del Deo in New Jersey, who was admittedly not an expert in virology also concurred with Dr. Easterday's opinion that the Drs. Dea and Van Alstine articles taught-away the use of MA–104 cells in PRRS research. Because Mr. Gould is neither an expert in virology nor a person of ordinary skill in virology, his opinion on this issue is of limited utility to the Court.

but rather encouraged the use of MA–104 cells in PRRS research.

Boehringer argues that Drs. Dea and Van Alstine's failure to isolate the PRRS virus "taught away" the use of MA–104 cells. In patent nomenclature, to "teach away" means that "a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken by the applicant." *Monarch Knitting Machinery Corp. v. Sulzer Morat Gmbh,* 139 F.3d 877, 885 (Fed.Cir.1998); *In re Gurley,* 27 F.3d 551, 553 (Fed.Cir. 1994).

Viewed at the relevant time, April 1991, and without the benefit of hindsight that neither EMC, swine influenza nor any of the other suspected causes of PRRS were responsible for the PRRS outbreak, these articles did not discourage others from following its path or lead investigators in a divergent path. These references specified the use of specific cell lines, reported the recovery of suspected causative agents of the PRRS virus, validated the use of MA104 cells in porcine viral research and encouraged further research. This falls short of the standard for "teaching-away."

Rather than "teaching-away" the use of simian cells, and MA–104 cells in particular, these two references provided a good deal of knowledge to one skilled in the art. Specifically, there is a substantial defense that these articles taught, at the very least, that Vero cells grew the porcine EMC virus and that MA–104 cells might have grown the swine influenza virus.[10] The articles also confirmed the thinking at the time that one (if not two) known viral agents was responsible for the PRRS outbreaks. These articles also affirmed the benefits of simian and MA–104 cells and would have, at the very least, informed a reader that simian and MA–104 cells were being used by experts in the field in their independent attempts to isolate the then-unknown porcine virus. The endorsement of MA–104 cells and simian cells, in each of the articles, certainly suggested their relevance in the PRRS inquiry such that there remains a substantial defense of obviousness.[11] Moreover, Dr. Van Alstine's successful growth of the porcine rotavirus from infected herds was also significant because it again pointed investigators to the use of heterological cells in their PRRS research, generally, and possibly MA–104 cells and when coupled with the uncontested fact that rotavirus was known in 1991 to grow on MA–104 cells, Tr. at 1.85–1.86 (Dr. Easterday said that *Diseases of Swine* taught in 1991 that rotavirus grew on MA–104 cells), there is a strong argument that Dr. Van Alstine's work further pointed PRRS investigators to the use of

**10.** I say "might have grown" with respect to the Dr. Van Alstine article because although Dr. Van Alstine reported his results, he did not specifically indicate which of the cell lines successfully grew the swine influenza virus.

It is also useful to respond to Dr. Easterday's assertion that Van Alstine's failure to include MA–104 cells initially in his array is indicative of the low status MA–104 cells held in the art at that time. First, I must note that the opposite conclusion can be drawn from Dr. Van Alstine's reference to MA–104 cells. Essentially, one could argue that although Dr. Van Alstine did not specify on which cell he grew the swine influenza virus, the fact that he specifically noted his inclusion of MA–104 cells may be indicative of the role MA–104 cells played in his experiment. Second, and perhaps most important, even assuming that Dr. Van Alstine's inclusion of MA–104 cells was a second thought, we are not here considering whether it was obvious for Dr. Van Alstine to use MA–104 but rather what his ultimate inclusion of that cell line taught to one skilled in the art in 1991. Accordingly, even assuming Dr. Van Alstine did not initially include MA–104 cells within his array, this impacts very little on this Court's consideration of obviousness in this case.

**11.** Here, I have discussed the Drs. Dea and Van Alstine articles together, as have the parties in their submissions to the Court. I note, however, that considering these articles independent of one another would lead to the same result.

MA–104 cells.[12]

The fact that neither Dr. Dea nor Dr. Van Alstine successfully solved the PRRS puzzle with their respective test arrays, does not necessarily detract from the general teaching their respective articles provided. As articulated by Dr. Steece, neither Dr. Dea nor Dr. Van Alstine knew that they failed in their search for PRRS. At the time, these pioneers thought that they were finding causal links to the PRRS virus. Indeed, Dr. Van Alstine concluded that swine influenza may be a causative agent for PRRS and Dr. Dea implied a similar conclusion with respect to EMC. These two known viruses were still contenders as causative agents or contributing causative agents of PRRS. *See* Pl. Exh. 26 (Executive summary of L.C.I. proceedings noting many possible causative agents including swine influenza virus; Dr. Loula noting seven possible causes of PRRS including EMC; Dr. Joo discussing EMC as possible cause of PRRS).

Therefore, although Drs. Dea and Van Alstine did not isolate what we now know to be the true cause of PRRS, Schering has raised a substantial question of whether these articles created a reasonable expectation of success in using MA–104 cells to isolate PRRS. Based upon the present record regarding the prior art alone, I am persuaded that Schering has articulated a substantial defense that not only did these two articles not "teach-away" the use of MA–104 cells but that these articles were instructive and taught that one would have a reasonable expectation of success using MA–104 cells in future PRRS research.[13]

In addition to relying on the prior art of Drs. Dea and Van Alstine to support its obviousness argument, Schering also sup-

ports its obviousness argument with an article published by Dr. Goldstein in 1970 entitled "Evaluation of Three Cell Culture Systems as Substrates for Influenza Virus Assay." In that article, Dr. Goldstein discussed the isolation of the various influenza viruses on primary rhesus monkey kidney (RMK), primary hamster kidney (HK) and canine kidney cells (CK). Pl. Exh. 22. Dr. Goldstein grew various influenza viruses, including swine influenza, on each of the three cell lines and concluded that monkey kidney cells (primary simian cells) which were "utilized extensively for influenza virus isolation and neutralization tests," were not the most sensitive of the three cell lines for influenzas and possessed several disadvantages to future testing. *Id.*

Schering argues that this article, especially in combination with the Drs. Dea and Van Alstine articles, teaches the use of simian cells in PRRS research. Boehringer counters, in part, that PRRS is symptomologically distinct from swine influenza such that one skilled in the art would not have consulted Dr. Goldstein's work and that since Dr. Goldstein did not use MA–104 cells in his research, the usefulness of his work is limited. *See* Pl. Find. Fact No. 27–32.

Because the Court has concluded that Schering has raised an obviousness defense with respect to Drs. Dea and Van Alstine's references, respectively, there is little need to determine whether the Dr. Goldstein article adds to Schering's defense of obviousness. Suffice it to say that Dr. Goldstein's article certainly does not teach-away the use of simian cells in research dealing with the swine influenza

---

12. Although the symptomology of porcine rotavirus is distinct from the concurrent respiratory and reproductive symptoms associated with PRRS, it was not ruled out as a contributing causative agent in 1990. Thus, despite Dr. Easterday's testimony that the work in porcine rotavirus would not have led one to use MA–104 cells, Tr. at 3.5, there is a substantial argument to the contrary.

13. Unfortunately, because both parties elicited testimony which focused on erroneous interpretations of the law, either obvious-to-try or exclusivity of success, there is little expert testimony from the recent hearing on the true issue of obviousness. The Court expects that this deficiency will be remedied at the upcoming trial in the related '778 Patent.

virus,[14] especially in light of Dr. Van Alstine's teachings regarding that virus and the use of MA–104 cells to isolate it.

In making this finding that the prior art itself raises a substantial defense of obviousness, I do not disregard Boehringer's vigorous argument that six of Schering's witnesses have "testified that it was *not obvious,* at the time of Boehringer's invention, that the PRRS virus would grow on simian cells." Pl. Br. at p. 15. Boehringer points to testimony from Dr. Hesse, an expert, that the growth of PRRS on MA–104 cells was not obvious to him, that he had no expectation that MA–104 cells would work when he used them after Boehringer's invention but that he would have to "try it and see." Pl. Br. at pp. 16–17. Boehringer also relies on the testimony of Dr. Steven Ellsworth, a senior scientist in Schering's laboratory, who testified that he personally did not have any expectation that a simian cell line would grow PRRS. Pl. Br. at 19. Boehringer also relies on the testimony of Laurier Couture, one of Schering's PRRS laboratory scientists who testified that one "can't have any reasonable expectation of growing a pig virus even on a pig cell line without first trying it," and that the same principle would apply to non-pig lines Pl. Br. at p. 17–18. In the same vein, Boehringer relies on Michelle Lau's testimony, another of Schering's PRRS laboratory scientists who also agreed that you have to try a cell because you have no "expectation of growing a virus on a given cell line without trying it." Pl. Br. at p. 18. The testimony of these scientists, however, does not sufficiently rebut Schering's defense of obviousness to warrant a preliminary injunction. Pl. Br. at 19.

Plainly speaking all this testimony communicates to the Court is that these scientists were of the mind that you cannot have any reasonable expectation of success with any cell line prior to personally trying the cell or learning of someone else's success with a particular virus on that particular cell line. This absolute adherence to a trial and error method without any reference to the potential teaching of the relevant art does not advance this Court's inquiry. In fact, it appears that the testimony of these scientists would also support the conclusion that no cell line may ever be obvious and no scientist should ever develop an expectation that a cell line will succeed, without, of course, first trying that cell line. With respect to the testimony of Drs. Steece and Ellsworth that they had no expectation of success with MA–104 cells, although this testimony is informative, it does not negate this Court's obligation to analyze the obviousness question from the reference point of the hypothetical ordinary person skilled in the art.

Boehringer also relies upon the testimony of Schering's expert Dr. Rowland who said that the body of literature regarding the growth of porcine viruses grows on simian cells would not "provide an incentive to exclusively use MA–104s and expect them to support the growth of PRRS virus" and that the material he relied upon in his expert report would not teach the exclusive use of MA–104 cells. Pl. Br. at 20 and 21. As discussed *supra,* testimony regarding whether the prior art would teach the exclusive use of MA–104 cells is irrelevant to this matter because exclusivity is far beyond the relevant standard in an obviousness inquiry. Consequently, this testimony from Dr. Rowland does nothing to challenge Schering's obviousness arguments.

Finally, Boehringer argues that the nonobviousness of its invention is demonstrated by Dr. Rowland's testimony that the literature from the Field's Virology table does not suggest the use of simian cells for the growth of PRRS and that the

---

14. Although Dr. Goldstien found that simian cells were the least efficient cell line in his research, "the fact that a specific [embodiment] is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered." *In re Lamberti,* 545 F.2d 747, 750 (Cust & Pat.App.1976).

references he relied upon in his expert report regarding the use of MA–104 cells to grow other viruses does not teach the use of simian cells to grow the PRRS virus. *See* Pl. Br. at pp. 19–20; Pl. Post–Hear Br. at p. 9, n. 34. Dr. Rowland's testimony at his deposition and at the recent hearing, however, was less decisive. Much of Dr. Rowland's testimony concluded that the literature he reviewed would not teach the exclusive use of MA–104 cells nor would it teach the use of MA–104 cells in an array with the expectation that those cells would work better than others. *See* Tr. at 5.58, 5.64. In fact when asked whether the literature attached to his expert report, which included the L.C.I. materials, would have "pointed a person of ordinary skill in the art in 1991 to simian cells to grow the PRRS virus," Dr. Rowland stated "I don't think they would have directly pointed somebody to use simian cells exclusively. That is correct." Tr. at 5.58. Dr. Rowland explained that he used the term "exclusively" to mean that if one used a number of cells in an array including simian cells, one would have a reasonable probability of success with that array. Tr. At 5.62. He further testified that one would have a probability that the simian cells would work but that the art probably did not teach that the simian cells would be "more apt to be successful in growing the virus than the other cells in your array, that is a tough—I ... would say probably not." Tr. at 5.63–5.645. Because Dr. Rowland's testimony was couched in terms of whether the art taught the exclusive use of MA–104 cells or taught that they would be better than other cells, his testimony is not as instructive as it could have been. Thus, despite Boehringer's arguments, Dr. Rowland's testimony does not support Boehringer's position fully on the specific question of whether the references attached to his expert report as Exhibit 5, the L.C.I. material, would have taught one skilled in the art that one would have a reasonable expectation of success growing the PRRS virus on MA–104 cells. The Court, of course, does not fault either party for the gaps in the record regarding the obviousness issue, but this is merely an example of how the testimony regarding obviousness needs to be fleshed out more.

The testimony relied upon by Boehringer may, at trial after being fleshed out, hinder Schering's ability to prove by clear and convincing evidence that the '563 Patent was obvious, but at this time, the testimony does not satisfy the Court that Schering's defense lacks substantial merit warranting the imposition of a preliminary injunction at this time.

Thus, based on the foregoing discussion, a review of the prior art and the hearing testimony regarding the prior art, the Court concludes that Schering has raised a substantial defense of obviousness to the '563 Patent. Next, the Court considers the secondary characteristics to complete its obviousness analysis.

### d. Secondary Characteristics:

The Supreme Court has said that:

Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origins of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Federal Circuit has repeatedly held that secondary considerations must be taken into account when assessing the obviousness of a patent. *See In re Soni*, 54 F.3d 746, 750 (Fed.Cir.1995); *Gillette Co.*, 919 F.2d at 725; *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed.Cir.1986); *Bausch & Lomb, Inc. v. Barnes–Hind, Inc.*, 796 F.2d 443 (Fed.Cir. 1986). The existence of secondary considerations, however, does not control the obviousness determination. *See Newell Companies v. Kenney Mfg. Co.*, 864 F.2d

757, 768 (Fed.Cir.1988); *Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 718 (Fed.Cir. 1991).

Boehringer contends that the secondary considerations also support their nonobviousness position. Despite Boehringer's arguments, however, the Court finds no reason to disturb its conclusions in *Boehringer I* that "at the most, that the commercial success factor supports its position," but that the commercial success is not "enough to overcome Schering's obviousness defense." *Boehringer I*, 984 F.Supp. at 257.

### i. *Commercial Success*

 It bears repeating that:

To satisfy its burden here, the plaintiff must not only demonstrate that Schering's obviousness defense lacks "substantial merit," (*see New England Braiding Co., Inc. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed.Cir.1992); *see also M & R Marking Systems, Inc. v. Top Stamp, Inc.*, 926 F.Supp. 466 (D.N.J.1996)), but it also bears the initial burden of establishing a prima facie case of nexus between the secondary characteristic—commercial success—and the merits of the claimed invention. *In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir.1995). Thus, the patentee bears the initial burden of demonstrating both that there is a commercial success and that there is a nexus between that which is patented and that which is sold. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir.1988).

*Boehringer I*, 984 F.Supp. at 257–8.

In the instant case, Boehringer's argues that its vaccines have been a tremendous commercial success and Schering does not present any serious defense to this showing. Therefore, I am satisfied that Boehringer's commercial success weighs in favor of nonobviousness as found in *Boehringer I*.

### ii. *Failure of others to Solve the PRRS mystery*

 In addition to commercial success, Boehringer argues that "long felt need for a PRRS vaccine" and the failure of others to solve the PRRS mystery supports a finding of nonobviousness. Despite the reincantation of the parties' respective positions on this issue since *Boehringer I*, there has been no change in the record which would warrant disturbing the finding in *Boehringer I* that the need to solve the PRRS mystery "should not be characterized as long felt." *Boehringer I*, 984 F.Supp. at 258.

In addition, the Court is troubled by Boehringer's argument that "there were four years, certainly if it had been obvious, someone would have found it." Pl. Find. Fact No. 49 (*quoting* Tr. at 3.41). What troubles the Court is that the subject matter of the '563 Patent which is being fought over in this case is the growth of the PRRS virus on MA–104 cells. One would conclude from Boehringer's above-quoted argument that nobody tried to grow PRRS on MA–104 cells prior to Boehringer's attempts in April 1991. We know, however, from Dr. Van Alstine's work that his team tried to grow the PRRS virus on MA–104 cells and Dr. Van Alstine published those results in October 1990—well before Boehringer's success in April 1991. Although Dr. Van Alstine did not succeed in isolating the then-unknown PRRS virus, the fact that Boehringer's solution to the PRRS mystery had been tried by Dr. Van Alstine with some results does not favor Boehringer's position that its invention was not obvious.

### iii. *Unexpected Results*

Boehringer also argues that its unexpected results and praise by those in the industry, including praise from Schering, is strong support for nonobviousness. Pl. Find. Fact No. 50. Specifically, Boehringer relies on an article in the journal "Swine Practitioner," published in November 1991 which commends Boehringer for having

"finally" solved the PRRS mystery. Pl. Find. Fact No. 50 (*relying on* Pl. Exh. 27); Pl. Exhs. 48, 49. Schering responds that the focus in this article on Dr. Collins' performing the "crucial step" of giving Dr. Harris "the right material to work with" confirms that the key to solving the mystery surrounding PRRS was the homogenate provided to Dr. Harris. Def. Crit. Find. Fact No. 50; Pl. Exh. 27.

 A conclusion of nonobviousness is supported by evidence that experts perceived the invention to be an exceptional scientific achievement and perceived the invention as an unexpected solution to a difficult problem. *See United States v. Adams*, 383 U.S. 39, 50–52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132 (Fed.Cir. 1985); *In re Piasecki*, 745 F.2d 1468, 1474–1475 (Fed.Cir.1984). A showing of unexpected results is often made with evidence that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would find surprising or unexpected. *Adams*, 383 U.S. at 51, 86 S.Ct. 708 (invention described as "wholly unexpected"); *Litton Systems, Inc.*, 87 F.3d at 1568 (describing invention as "pioneering"); *W.R. Grace & Co.-Conn., v. Intercat, Inc.*, 7 F.Supp.2d 425, 463 (D.Del.1997). "The basic principle behind this rule is straight forward—that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." *In re Soni*, 54 F.3d 746, 750 (Fed. Cir.1995). An examination for unexpected results is a factual, evidentiary inquiry. *See In re Johnson*, 747 F.2d 1456, 1460 (Fed.Cir.1984).

 In this case, it is not clear from the evidence submitted to the Court by Boehringer that the praise in the industry over Boehringer's work was based on its work or the work of Drs. Collins and Benfield. Moreover, the evidence is insufficient at this time to inform the Court whether the praise in the industry for Boehringer's work was accompanied by surprise that it was MA–104 cells that facilitated the isolation of the PRRS virus or just relief that the causative agent had been identified. Although Boehringer's Dr. Harris was called "clever" and Boehringer was praised for sharing its work with the Government this evidence does not tip the scales of unexpected results in favor of Boehringer. Thus, "unexpected results" does not favor either party in this dispute.

### iv. *Independent Development*

Schering argues that the contemporaneous work of others indicates the obviousness of the '563 Patent. Specifically, Schering points to the prior and contemporaneous work of Drs. Ohlinger, Meetz, McGinley, Hesse and Nelson support a finding of obviousness. Def.'s Find. of Fact No. 10–14. Boehringer challenges that the work of these scientists represents work by experts rather than scientists with ordinary skill in the art as is the standard under section 103. Pl. Crit. Find. Fact Nos. 10–14. Boehringer also challenges the factual basis for Schering's assertion that these scientists had success growing the PRRS virus.

 Independent contemporaneous invention by others may be an indication of non-obviousness. *Stewart–Warner Corp. v. City of Pontiac*, 767 F.2d 1563 (Fed.Cir. 1985). The Federal Circuit has "acknowledged the view that this evidence is relevant as a secondary consideration." *Monarch Knitting Machinery Corp.* 139 F.3d at 883 (*relying on Medtronic, Inc., v. Daig Corp.*, 789 F.2d 903, 906 (Fed.Cir.1986)). The contemporaneous work is only relevant if it is conducted by one of ordinary skill and not based upon some extraordinary skill in the art. *Id.* at 884. Here, for the reasons articulated in Boehringer's critique of Schering's Finding of Fact Nos. 10–14, the evidence of the results of these "contemporaneous" experiments is not sufficient at this time to support a conclusion that the work of these scientists supports a

finding of obviousness. Essentially, Schering's evidence of these "contemporaneous" experiments does not satisfy the Court that these experiments occurred with the results described by Schering. For example, the Court is not satisfied that Schering has presented sufficient evidence that Dr. Meetz or Dr. Ohlinger cultured the PRRS virus or that they chose MA–104 cells for any particular reason other than that they were available at the time. Nor is the Court satisfied that the other evidence of "contemporaneous" work has been developed enough to favor Schering, at this time.[15]

### e. Summary

■ Although the secondary characteristics add limited weight to Boehringer's claim, they do not change the outcome of the obviousness determination discussed above. As I found in *Boehringer I*:

> At this preliminary stage, the court need not conclusively resolve the validity question, but rather, it must 'make an assessment of the persuasiveness of the challenger's evidence recognizing that it is doing so without all evidence that may come out at trial.' *New England Braiding, supra*, at 883. The court may deny a preliminary injunction because the evidence raises a substantial question even though the defense may not be 'entirely fleshed out.' *See Id.*

*Boehringer I*, 984 F.Supp. at 258. Given the defense Schering has raised regarding the validity of the '563 Patent, this Court cannot be swayed by proof of commercial success.

The attorneys for both Boehringer and Schering have done an exceptional job presenting the evidence to the Court. Despite this commendable effort, however, given the underlying facts of this case, the question of obviousness remains a close call. The substantial issues that remain regarding obviousness render it legally inappropriate to grant the extraordinary relief requested by Boehringer.

Therefore, I find that Boehringer has failed to establish a likelihood of success on the merits to warrant the imposition of a preliminary injunction.

### 2. Other Validity Arguments—Inequitable Conduct

In light of my conclusion that Schering has raised a substantial defense with respect to obviousness, I need not consider other validity arguments. I will however, discuss Schering's argument that Boehringer engaged in inequitable conduct with respect to the '563 Patent.[16]

Inequitable conduct means any "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Refac International, Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1581 (Fed.Cir.1996) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995)). Where a court finds that a patentee engaged in inequitable conduct, it may invalidate the patent. *See Refac International, Ltd.*, 81 F.3d 1576. The party alleging "inequitable conduct" must prove the "threshold elements" of materiality and intent by clear and convincing evidence. *Id.* However, in the instant preliminary injunction proceeding, Boehringer bears the burden of demonstrating that Schering's defense lacks substantial merit.

Here, Schering makes a number of arguments regarding Boehringer's alleged

---

**15.** By separate Order today, this Court denies Boehringer's request to strike certain deposition testimony from the record as requested in a letter-application dated June 25, 1999. As reflected in this Opinion, however, the information submitted late by Schering does not impact the outcome of Boehringer's motion for preliminary injunction.

**16.** Given the conclusions above regarding Schering's defense of obviousness as well as below with respect to irreparable harm, the Court will not address Schering's remaining arguments challenging the '563 Patent under 35 U.S.C. § 112.

inequitable conduct. For purposes of this discussion these arguments can be reduced to the following: (1) that Boehringer failed to highlight the material prior art in its '563 Patent application, (2) that Boehringer intentionally mischaracterized the Drs. Collins and Benfield homogenate work as part of "The Invention," and (3) that Boehringer intentionally withheld information from the USPO in the '563 Patent prosecution regarding Schering's arguments and this Court's opinions in the '778 litigation. *See* Def. Post-hearing Br. at pp. 19–20.

In *Boehringer I,* I set forth the general standards that apply to analyses of inequitable conduct:

> In conducting its analysis, this court must examine the totality of the circumstances and decide whether the patent applicant's conduct was so "culpable that the patent should not be enforced." *Molins, supra,* at 1178; *see also Id.* ... "Intent" means "design, resolve, or determination with which a person acts; a state of mind in which a person seeks to accomplish a given result through a course of action." *Molins, supra,* at 1180. It "need not be proven by direct evidence" and is "most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor." *Id.* Because this court's inquiry must consider materiality and intent together, "the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct." *Akzo N.V. v. United States International Trade Commission,* 808 F.2d 1471, 1481–82 (Fed.Cir.1986).

*Boehringer I,* 984 F.Supp. at 261.

These legal standards and others articulated below will be applied to each of Schering's arguments that Boehringer engaged in inequitable conduct.

### a. *Failure to highlight the Drs. Dea and Van Alstine articles*

Schering argues that Boehringer intentionally buried the Drs. Dea and Van Alstine articles in "the LCI booklet containing 20 other articles, and that the booklet itself was one of 95 pieces of prior art which BI sent in to the Patent Office, ..." Def. Post–Hearing Br. at p. 20. Schering goes on to charge that it was Boehringer's intention "(1) to load the Examiner up with as many prior art references as it could (even though many, if not most, were not nearly as relevant as others); (2) to provide the Examiner with no information from which the Examiner could have appreciated the nature of the issues that are presently being discussed; and then (3) to come before this Court and argue that their claims are patentable because the Examiner did not reject [the '563 Patent]." *Id.* at 21.

Boehringer counters that the L.C.I. booklet containing the subject articles was submitted to the USPO "with only sixteen other references" in June 1992 prior to the initiation of any litigation in the '778 Patent case, and that the other approximately 95 references considered by the USPO were added by Boehringer and the USPO after the Examiner had already considered the L.C.I. booklet several times. Pl. Post–Hearing Br. at pp. 35–36; Pl. Reply Br. at pp. 5–6. Boehringer also challenges the validity of Schering's legal argument that Boehringer was obligated to highlight this prior art, Pl. Reply Br. at p. 6, as well as Schering's failure to allege and prove the requisite intent needed to satisfy a claim of inequitable conduct.

■■■ Several courts have held that burying a relevant, material prior art reference among a multitude of less pertinent references can support a finding of inequitable conduct. *See e.g., Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.,* 359 F.Supp. 948, *aff'd,* 479 F.2d 1328 (5th Cir.1973), *cert. denied,* 414 U.S. 874, 94 S.Ct. 66, 38 L.Ed.2d 115 (1973) (inequitable conduct found where patentee mischaracterized a reference and then buried it as the thirteenth of thirteen references submitted to

the USPO); *Golden Valley Microwave Foods Inc. v. Weaver Popcorn Co., Inc.,* 837 F.Supp. 1444 (N.D.Ind.1992), *aff'd w'out op.* 11 F.3d 1072(Fed.Cir.1993), *cert. denied,* 511 U.S. 1128, 114 S.Ct. 2136, 128 L.Ed.2d 865 (1994). Where, however, evidence is lacking that the prior art was intentionally buried among irrelevant or less relevant art, the absence of such intent precludes a finding of inequitable conduct. *See Molins PLC,* 48 F.3d 1172 (reversing district court and finding that no intent was proven where patentee disclosed references in reexamination proceedings and Examiner reviewed references); *Litton Systems, Inc. v. Honeywell, Inc.,* 1995 WL 366468 (C.D.Cal.1995) (no inequitable conduct proven based upon burying of references). Requiring a strong showing of intent before making a finding of inequitable conduct based upon a burying argument is consistent with the teaching that a patent lawyer "should be encouraged to err on the side of inclusion, thereby providing as much prior art with an application as possible." *Litton Systems,* 1995 WL 366468, *38 (C.D.Cal.1995).

██ Based upon the present record, I conclude that Schering has failed to set forth even a mildly tenable defense of inequitable conduct based upon Boehringer's submission of the L.C.I. booklet to the USPO without highlighting the Drs. Dea and Van Alstine articles. Here, Boehringer supplied the USPO with 17 references in June 1992 in support of its Patent. Of those 17 references, Boehringer submitted the L.C.I. booklet which itself contains a number of prior art references including the Drs. Dea and Van Alstine references. This Court has reviewed the L.C.I. booklet and finds that it was appropriate for Boehringer to submit the entire booklet, rather than just the Drs. Dea and Van Alstine articles, to the USPO because the booklet is very instructive of the state of the art in 1990. The booklet was assembled as a package of material and it was appropriate for Boehringer to submit the package as a whole to the USPO. Indeed, this Court

suggests that if Boehringer had separated out references from the L.C.I. booklet rather than submitting the L.C.I. booklet to the USPO in total, Schering would have argued that Boehringer misrepresented the state of the art.

It is clear from the manner in which Boehringer disclosed this prior art that Boehringer neither actively concealed nor mischaracterize these references nor attempted to bury them in a late submission to the USPO. Rather Boehringer disclosed the references early in the '563 prosecution along with a reasonable number of other references. Therefore, Boehringer's production of the Drs. Dea and Van Alstine references does not support a defense of inequitable conduct.

Moreover, Schering has not shown that Boehringer manifested any nefarious intent in not highlighting the Drs. Dea and Van Alstine references. In fact, Schering's argument that Boehringer *intentionally* neglected to highlight the Drs. Dea and Van Alstine articles is not supported by the underlying facts. The fact that it took Schering until October 1998 to rely upon the Drs. Dea and Van Alstine articles and highlight their significance to Boehringer detracts significantly from Schering's ability to show that Boehringer acted inequitably in 1992 when it first submitted the references to the USPO. Specifically, since Boehringer first supplied the Drs. Dea and Van Alstine references to the USPO in the '563 Patent prosecution in June 1992 and Schering did not disclose until October 1998 that it even considered those references to be relevant, material prior art, it is difficult for Schering to make a case that Boehringer knew in June 1992 that these two articles should have been highlighted over the other relevant prior art. Without showing that Boehringer knew that it should have highlighted these articles back in 1992, Schering cannot show any deceptive intent in failing to highlight these references. Thus, even assuming *arguendo* that Boehringer should have highlighted these two articles in 1992,

there is nothing about Boehringer's conduct in this regard that could support a finding of deceptive intent.

Accordingly, Schering has not raised a substantial defense on these fact that Boehringer engaged in inequitable conduct by not highlighting the Drs. Dea and Van Alstine articles to the USPO.[17]

b. *Failure to disclose Drs. Collins and Benfield's work as Prior Art*

Schering also reiterates its argument that Boehringer engaged in inequitable conduct by referring to the work of Drs. Collins and Benfield in the '563 specification and disguising that work as its own. Essentially, Schering argues again that if Boehringer did not list Drs. Collins and Benfield as joint inventors, their work constitutes prior art, which, according to Schering should have been specifically disclosed to the Examiner. This Court considered and rejected this argument in *Boehringer I* and held that "[t]here is nothing in Collins and Benfield's work that would have made the '778 Patent obvious." *Boehringer I*, 984 F.Supp. at 261. Dr. Collins' testimony and the other "new evidence" Schering has brought to light in an effort to resuscitate this argument does nothing of the kind. *See* Def. Find. Fact No. 30; Def. Crit. Find. Fact 43. Therefore, this Court will not revisit this issue and holds again that this argument does not represent a serious defense.

c. *Failure to Disclose '778 Litigation Materials in the '563 Patent Prosecution*

Schering next argues that Boehringer engaged in inequitable conduct when it failed to disclose to the USPO in the '563 Patent prosecution material information gathered in the '778 Patent litigation, including the briefs filed by Schering, Schering's expert reports and this Court's previous opinions. Essentially, Schering argues that:

> Although BI has supplied the Patent Office with the references (amongst the 95 it submitted), what BI has not supplied to the PTO is Schering's pleadings and arguments which would permit the Examiner to understand why the alleged invention would be obvious in view of the prior art and whether there was a teaching and motivation in the art to practice the claimed invention. Nor has BI supplied the PTO with Schering's papers which highlight BI's failure to disclose relevant prior art in the '778 prosecution the effect of which can render the related claims in the '563 Patent unenforceable.

Def. Br. at p. 11. Boehringer disputes these allegations.

■ As discussed briefly above, inequitable conduct "includes an affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Total Containment, Inc. v. Environ Products, Inc.,* 921 F.Supp. 1355, 1369, (E.D.Pa.1995), *aff'd in part, vacated in part,* 106 F.3d 427 (Fed. Cir.1997). To support a finding of inequitable conduct for failure to disclose material information one must show "(1) material information, (2) knowledge by the applicant or the attorney of that information and of its materiality, and (3) an intent by the applicant or the attorney to mislead the PTO." *Environ Products, Inc. v. Total Containment, Inc.,* 1997 WL 364464 (E.D.Pa. June 19, 1997) (*relying on FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 (Fed.Cir.1987)).

17. Schering's expert testimony regarding this issue is particularly telling. Mr. Manbeck testified that Boehringer complied literally with 37 C.F.R. § 1.56 in its production of these references to the USPO especially given the fact that the Examiner checked-off all of the articles attached to Boehringer's application, including the L.C.I. booklet. Mr. Manbeck opined, however, that Boehringer did not comply with the non-mandatory MPEP section 2000–8 which suggests that the applicant highlight the important documents to be reviewed when a long list of documents is submitted to the examiner. Tr. at 5.140.

Thus the first consideration is whether the information not disclosed to the USPO is material. That inquiry is controlled by 37 C.F.R. § 1.56 which was amended in 1992 when the '563 Patent was pending. That section provides that information is material:

when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (hereinafter referred to as "USPO Rule 56").[18] While that section does speak exclusively to the materiality of information generated by prior litigation, the Manual of Patent Examining Procedure (hereinafter referred to "MPEP") section 2001.06(c) provides as follows:

"Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the Patent and Trademark Office; such as, for example, evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of 'fraud,' 'inequitable conduct,' or violation of duty of disclosure. Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, deposition, and other documents, and testimony."

MPEP § 2001.06(c) (6th Ed.1995, rev. July 1996). Although MPEP § 2001.06(c) is not binding law, it is a useful tool to inform the Court of the USPO's official interpretation of C.F.R. § 1.56(b) regarding information brought to light during litigation.

Applying this standard to the present dispute, Boehringer argues that its submission to the USPO of the underlying prior art discharged its duty under USPO Rule 56 and there was nothing in the '778 Patent litigation which it was obligated under Rule 56 to disclose to the USPO. While submission of prior art may satisfy Rule 56 with respect to that prior art, the mere fact that an applicant produced prior art to the USPO does not end the inquiry. Rather, a court must analyze the other types of information generated in the prior litigation and determine whether that information was material to the pending patent application. Thus the issue is whether the arguments made by Schering, Schering's expert reports, this Court's opinions and other information from the '778 Patent litigation was material to the '563 Patent prosecution. Here, the information can be broken down into two categories.

### i. *Existence of prior litigation*

██ Schering first argues that Boehringer failed to properly inform the USPO of the existence of the '778 Patent litigation because Boehringer only informed the USPO orally of the litigation. While Schering is correct that the preferred means of communicating with the USPO is

---

18. The Court applies the amended standard under 37 C.F.R. § 1.56 because the '563 Patent was pending after this amendment became effective. Boehringer has requested that this standard apply to this inquiry and Schering has not disagreed.

in writing, the form of a communication cannot form the basis of a claim of inequitable conduct. *See Haney v. Timesavers, Inc.*, 900 F.Supp. 1378, 1382 (D.Or.1995) (holding that complaint about how information about prior litigation was communicated to the USPO cannot "form the basis for a claim of inequitable conduct."). A finding of inequitable conduct is too grave a finding to be based upon a distinction between whether a disclosure was made orally or in writing—the question is whether a disclosure was made at all. Here, it appears that Boehringer disclosed the existence of the '778 Patent litigation to the USPO. Therefore, this cannot be the basis of an inequitable conduct defense.

### ii. *The arguments and opinions in the '778 Patent litigation*

The next issue is whether Boehringer's failure to disclose in the '563 Patent prosecution Schering's arguments in the '778 Patent litigation, its expert's opinions and this Court's opinions in *Boehringer I* and *Boehringer II* supports a finding of inequitable conduct. Schering argues that:

BI's intentional decision to cite only the prior art from the prior litigation, and not to bring to the attention of the PTO 'significant information' which has been brought to its attention by both the Court, in its prior decision, and Schering, in its pleadings and expert reports, raises substantial issues with regard to whether BI satisfied the uncompromising 'duty of disclosure' owed to the PTO.

Def. Concl. Law No. 6. In response, Boehringer argues that it complied with USPO Rule 56 by providing to the USPO the underlying prior art and that it is not a violation of that Rule to not disclose the details of an ongoing litigations. Pl. Find. Fact No. 123. Boehringer further argues that it did not want to inundate the USPO with all of the material filed in the '778 Patent litigation and that it would not have been helpful to the USPO to provide it with the Court's opinions because the examiners are not lawyers and therefore would not have understood the Court's opinions. Pl. Find. Fact Nos. 114, 115, 118 and 122.

There have been very few reported decisions analyzing the application of Rule 56 to a party's failure to disclose to the USPO information gathered during a related litigation. *See for example, Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed.Cir.1997) (invalidating two patents for inequitable conduct based in part on patentee's failure to disclose relevant information from related litigation); *Environ Products, Inc.*, 1997 WL 364464 (applying Rule 56 to inconsistent statements made by patentee during related litigation); *Haney*, 900 F.Supp. 1378 (finding no inequitable conduct occurred where existence of prior litigation was disclosed to USPO); *Golden Valley*, 837 F.Supp. 1444 (patentee engaged in inequitable conduct, in part, by intentionally failing to disclose issues raised and contradictory statements made in related litigation). Schering has provided this Court and Boehringer with a recent unpublished decision in *Newell Window Furnishings, Inc. et al. v. Springs Window Fashions Division, Inc.*, Civ. No. 98–50003, from the Northern District of Illinois decided on October 7, 1999. The *Newell* opinion, a copy of which is contained within the Clerk's Office's file on this case, held that a patentee's intentional failure to disclose to the Patent Office the district court's denial of the patentee's preliminary injunction motion supported a finding of inequitable conduct. In sum, although the opinions addressing inequitable conduct allegations based upon information gathered in related litigation are few in number, the opinions teach clearly that Rule 56 and traditional inequitable conduct law apply to information gathered from related litigation.

▇▇▇ The first issue of materiality here can easily be resolved. "A patent applicant's duty to disclose is not limited to disclosing prior art." *Critikon, Inc.*, 120 F.3d 1253, 1258 (Fed.Cir.1997) (holding

that applicant has duty to disclose prior art as well as prior litigation when both are material under USPO Rule 56); *Environ Products, Inc.*, 1997 WL 364464 (applying duty of disclosure to inconsistent statements made by patentee during related litigation). These cases and the text of Rule 56 demonstrate that Rule 56 is not by its terms or application restricted to prior art references. *See* 37 C.F.R. § 1.56(b)(2) (information is material if it is not cumulative and "refutes, or is inconsistent with, a position the applicant takes ... ").

■ The fact that Boehringer provided the most material information, the prior art, to the USPO, does not preclude the possibility that the parties' arguments or this Court's opinion might also be material non-cumulative information under USPO Rule 56(b). Rule 56 is clear that where information "by itself or in combination with other information, [establishes] a prima facie case of unpatentability of a claim," that information is material. 37 C.F.R. § 1.56(b)(1). Although the prima facie standard has not been tested often in the Federal Circuit since its adoption in 1992, Rule 56 states that a prima facie case of unpatentability is established "when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability." USPO Rule 56(b).

Thus, the prima facie standard requires consideration of whether the new information compels a conclusion of unpatentability under a preponderance of the evidence standard without consulting the patentee's response to the new information. Here, there are several arguments raised by Schering and conclusions articulated by this Court in the '778 Patent litigation which satisfy this standard. For example, the obviousness arguments presented by

Schering in *Boehringer I* which this Court found to present a substantial defense to Boehringer's motion for preliminary injunction was material to the USPO's review of the '563 Patent. This Court's conclusion in *Boehringer I* that a substantial issue persisted about the obviousness of the '778 Patent was material to the '563 Patent in that it would have, without consideration of Boehringer's response, compelled a conclusion of unpatentability. Therefore, given the materiality of this information Schering has raised a substantial defense that Boehringer violated Rule 56.

As discussed above, however, a violation of USPO Rule 56 does not in itself support a defense of inequitable conduct. Rather, there must be proof that the patentee knew of the materiality of the information and that the patentee intended to deceive or mislead the USPO. *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1559–60 (Fed.Cir.1984). "Once thresholds of materiality and intent have been established, the court conducts a balancing test and determines whether the scales tilt to a conclusion that 'inequitable conduct' occurred. The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon, Inc.*, 120 F.3d at 1256 (internal citations omitted).

Thus, since materiality of the prior litigation has been established to a degree sufficient to support a defense of inequitable conduct at this stage of the litigation and Boehringer's counsel prosecuting the '563 Patent knew of the Court's opinions and the underlying arguments and has not sufficiently explained their failure to cite the information to the USPO, the next inquiry is whether a sufficient level of intent has been established to support Schering's defense. It is often said that intent "need not be proven by direct evidence" and is "most often proven by a showing of acts, the natural consequences of which are presumably intended by the

actor." *Molins,* 48 F.3d at 1180. Intent may be inferred where the applicant knew, or should have known, that the material withheld would have been material to the USPO's consideration of the pending patent. *Critikon, Inc.,* 120 F.3d at 1256. "[A] finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Medical Consultants Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988).

Boehringer's failure to disclose to the USPO anything about the '778 Patent litigation except its mere existence and the fact that some of the prior art came from that litigation, gives this Court great pause. The fact that Boehringer did not provide the USPO, in writing, with the name of the pending case, its docket number, the district in which it was pending and this Court's conclusions, establishes a threshold showing of intent to deceive and a lack of good faith. On this record, it firmly appears that Boehringer did not want the USPO to delve into the '778 litigation and learn of Schering's arguments and this Court's opinions. Boehringer's bare bones disclosure of the existence of the litigation and its utter failure to share the substance and status of that litigation with the USPO leads to a fair level of intent inferred against Boehringer. The materiality of the concurrent '778 Patent litigation which challenged both the validity and enforceability of the subject matter of the pending '563 Patent application is obvious. With such a strong showing of materiality, the level of intent needed in this case is substantially lowered.

While Boehringer did disclose to the USPO the existence of the '778 litigation and the underlying prior art, *compare with Critikon,* 120 F.3d at 1256–1258 (strong inference of intent inferred when litigation and prior art were not disclosed),

because Boehringer failed to disclose the arguments raised and the outcome of the preliminary injunction and summary judgment proceedings, an inference of deceptive intent on Boehringer's part sufficient to establish the substantial merit of Schering's defense may be inferred. Boehringer's failure to at least make a good faith attempt to apprise the USPO of the issues raised and conclusions drawn in the '778 Patent litigation informs this inference of intent. If Boehringer had made a good faith attempt by at least providing the USPO with a copy of the Court's opinions and a list of the parties submissions in the '778 litigation, such good faith disclosure would go a long way to rebut Schering's allegations of inequitable conduct and nefarious intent. Rather, given the Boehringer's failure to apprise the USPO of any of the substance of the '778 litigation, it is faced now with a negative inference of intent drawn against it. Moreover, Boehringer fails in its claims that it did not disclose portions of the '778 litigation because it wanted to be even-handed in its disclosures to the USPO. Pl. Find. Fact No. 117. It should go without saying that even-handedness is not the standard for disclosure. Rule 56 does not speak of even-handedness and no applicant is permitted to forego disclosing unfavorable information by also foregoing the disclosure of favorable information. Rule 56 does not allow an applicant to pick and choose between material information but requires that all material information be disclosed to the Patent Office. *See* 37 C.F.R. § 1.56.

Boehringer also misses the mark with its arguments that the Examiners would not have understood the Court's decision on Boehringer's first preliminary injunction decision and that it did not want to inundate the USPO with too many documents. Putting aside the insult the former argument brings to bear upon the USPO, Boehringer tries to minimize its responsibility under Rule 56 to provide the USPO with material information. Boehringer is

not within its right to decide what the USPO can or cannot understand. Rather, an applicant is bound by its disclosure obligations as set forth in USPO Rule 56 and it is up to the USPO to decipher the material. Moreover, Boehringer's argument is inconsistent with the fact that an applicant can explain references to the USPO such that Boehringer could have explained how the different standards for a preliminary injunction should be interpreted by the USPO.[19]

With respect to the latter argument that Boehringer did not want to inundate the USPO with too much paperwork, this argument is frivolous. Where information is material, it must be disclosed to the USPO. That is what is required by USPO Rule 56, plain and simple. Moreover, Boehringer's all or nothing approach contravenes the clear intent of this Rule. Rule 56 is quite clear that information which is cumulative is not material and therefore need not be provided to the USPO. *See* 37 C.F.R. § 1.56(b) ("Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, ...."). Therefore, to the extent that the material in the '778 Patent litigation would have been voluminous, it too may have been cumulative and out of the reach of Rule 56. It was Boehringer's obligation as an applicant to provide the non-cumulative material information to the USPO.

Similarly, Boehringer erroneously argues that this case is analogous to *Haney v. Timesavers, Inc.*, 900 F.Supp. 1378 (D.Or.1995). In *Haney*, the district court granted a motion for summary judgment on the issue of inequitable conduct finding no such conduct occurred where the patentee failed to disclose material from a prior litigation. The *Haney* court found that since the patentee disclosed the underlying material prior art to the USPO in the subsequent patent prosecution and the USPO knew of the prior litigation, there was no inequitable conduct. The difference, however, between *Haney* and the case at bar is the relevance of the court's prior rulings. There is no mention in *Haney* that the court's prior rulings were relevant to the subsequent patent proceeding. As discussed above, given the serious arguments and conclusions drawn in the concurrent '778 Patent litigation, this case stands apart from *Haney* and leads to a substantial defense of inequitable conduct.[20]

In conclusion, given the Court's factual conclusions regarding materiality and intent based upon the current record, the Court finds that Schering has demonstrated a serious defense to the enforcement of the '563 Patent and Boehringer has not satisfied this Court that the defense lacks substantial merit. Therefore, the allegations of inequitable conduct in this case prevent Boehringer from establishing a likelihood of success on the merits suffi-

---

**19.** Boehringer argues that if Schering is correct that it should have disclosed material to the USPO from the '778 Patent litigation, then Schering also committed inequitable conduct in the prosecution of its own patent because it failed to disclose expert reports to the USPO which may satisfy USPO Rule 56. The possibility that Schering may have violated Rule 56 in its own patent practice does not, at this time, mean that this Court should ignore the relevant legal standard as it applies to the '563 patent prosecution.

**20.** In contrast, Schering's argument that Boehringer engaged in inequitable conduct by failing to disclose the Drs. Dea and Van Alstine references in the '778 Patent litigation

lacks substantial merit. There is insufficient evidence in the record to give life to this defense. The evidence in the record does not support a finding that the materiality of the information was known at the time and that there was intent to withhold the information from the USPO. *See* Pl. Find. Fact Nos. 95–96; *Nintendo of America Inc. v. Magnavox Co.*, 707 F.Supp. 717 (S.D.N.Y.1989). Moreover, given that the level of intent necessary to prevail in this equitable proceeding has not yet been established, it has not yet been established that the failure to disclose these references would impugn the validity of the '563 Patent. Therefore, this argument also does not form the basis of a sufficient defense now.

cient to warrant the imposition of a preliminary injunction.

### 3. Infringement

As I have already noted, Schering has not contested infringement for the purposes of this preliminary injunction claim. Def. Crit. Find. Fact No. 60. Therefore, there is no issue as to infringement but Schering's defense of obviousness impugns the validity of the '563 Patent.

### 4. Summary

A party is not entitled to a preliminary injunction unless it carries its burden on both the likelihood of success and the irreparable harm factors. *See Reebok Int'l,* 32 F.3d at 1556. The court must deny the preliminary injunction where the movant has failed to carry its burden on either factor. Therefore, since I have concluded that Boehringer has not demonstrated its likelihood of success on the merits, given Schering's defenses of obviousness and inequitable conduct, I need not consider whether Boehringer has met its burden of demonstrating irreparable harm. *See Id.; New England Braiding Co.,* 970 F.2d at 883. Given the persistence of the parties with respect to irreparable harm and the unusual procedural history of this case, however, the Court will make findings with respect to irreparable harm.

### B. Irreparable Harm

■ Where a patent holder demonstrates a strong likelihood of success on the merits of its infringement action and proof of continuing infringement, the patent holder is entitled to a rebuttable presumption of irreparable harm. *See Polymer Technologies, Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed.Cir.1996); *Reebok Int'l, Ltd.,* 32 F.3d at 1556. Given the conclusions in section IV(A)(1) *supra* with respect to Schering's defense of obviousness and *supra* section IV(A)(2) with respect to Boehringer's inequitable conduct, Boehringer has failed to meet its burden of showing a strong likelihood of success and

thus, cannot avail itself of that presumption. *See PPG Industries,* 75 F.3d 1558, 1566 (Fed.Cir.1996); *Circle R. Inc. v. Smithco Mfg.,* 919 F.Supp. 1272, 1301 (N.D.Iowa 1996).

Thus, absent a presumption of irreparable harm, Boehringer bears the burden of demonstrating such harm. Boehringer argues that if it is denied a preliminary injunction, it will be irreparably harmed because its ability to establish itself as a market leader will be damaged, its technology may be displaced by ongoing research during the pendency of this "litigation and the related '778 patent litigation," the market is naturally diminishing, jobs and research projects are reduced as Boehringer loses its market share to Schering and Boehringer's goodwill is damaged by Schering's product. Schering counters that if Boehringer prevails on the merits of its case, Schering is a viable company which can compensate Boehringer for its losses due to Schering's infringement. Schering also challenges the legal basis of Boehringer's irreparable harm arguments.

Even crediting Boehringer's arguments in favor of irreparable harm, given the unique procedural history and immediate future of this and the related '778 Patent case, Boehringer has not demonstrated that it will suffer irreparable harm to satisfy its burden. Specifically, a jury is scheduled to be selected in less than two weeks' time and will at that time begin receiving evidence in the '778 Patent case. That trial is expected to last approximately four weeks such that a final conclusion in the '778 litigation is expected in less than two months from the issuance of this Opinion. The fact that a trial in the related patent is imminent and that that trial may obviate the need for an injunction in this case, reduces Boehringer's risk of irreparable harm to a de minimis level. *See Biacore, AB v. Thermo Bioanalysis Corp.,* 1998 WL 372242 (D.Del. June 26, 1998) (delay in pursuing injunction and imminent trial precluded finding of irreparable harm).

**554**

In fact, if the jury finds in Boehringer's favor and concludes that Boehringer's '778 Patent is valid and that Schering has infringed that patent, this Court would certainly entertain an application to enjoin Schering from further infringing Boehringer's '778 Patent. An injunction from infringing the narrower '778 Patent would by its terms also enjoin infringement of the broader '563 Patent. Therefore, assuming Boehringer succeeds in the '778 litigation, Schering's alleged infringement of the '778 and '563 Patents would cease within less than two months of this Opinion being issued. The fact that an infringer will cease its infringing activities more than adequately rebuts traditional claims of irreparable harm, such as those proffered by Boehringer in this action, and renders the risk of such irreparable harm *de minimis*. *See Reebok*, 32 F.3d 1552 (harm reduced to de minimis level where patentee was ceasing production of infringed goods).

Even if Boehringer fails at the upcoming trial to persuade the jury that its '778 Patent is valid or enforceable such that Schering is not enjoined from selling its PRRS vaccine, such a conclusion will likely validate this Court's determination that Boehringer does not have a likelihood of success on the merits in the present case such that it would be inequitable to grant a preliminary injunction in this matter at this time. For example, if the jury concludes that Boehringer engaged in inequitable conduct with respect to the '778 Patent, such a finding might impugn the validity of the '563 Patent and support a conclusion that Boehringer lacks a likelihood of success on the validity of the '563 Patent.[21] Without such a chance of success, it would be inequitable for this Court to enjoin Schering now. By the same token, if the jury finds that Boehringer's '778 Patent was obvious under section 103, that obviousness would, of course, infect the '563 Patent and would

validate this Court's conclusion today that Schering possesses a substantial defense of obviousness to the '563 Patent. Upon such a finding, it too would be inequitable for this Court to have enjoined Schering from producing its PRRS vaccine. Therefore, there are a number of scenarios whose outcomes will be known in approximately six weeks that may either render Boehringer's irreparable harm argument moot or would illustrate the inequities of imposing an injunction at this time.

There is, of course, the possibility that the jury will find that Boehringer's '778 Patent is valid but also find Schering's PRRS vaccine does not infringe the '778 Patent. If that were the case, given the greater breadth of the '563 Patent compared to the '778 Patent such a finding would not preclude a later determination that while Schering did not infringe the '778 Patent, it does infringe the '563 Patent. In such a case, a trial on the '563 Patent will likely be necessary. To reduce the risk that Boehringer will suffer irreparable harm if this scenario becomes a reality, the Court is prepared to schedule the trial in the '563 matter for the Spring 2000. Therefore, should the '563 Patent need to be presented to a jury, it will commence within four to six months of the conclusion of the '778 trial. With such a schedule, there will be little opportunity for Boehringer to experience irreparable harm warranting an injunction at this time.

Indeed, given the limited window of opportunity for Boehringer to be harmed between the two trials, there is no reason why Schering cannot compensate Boehringer for that harm. The Federal Circuit has repeatedly held that in the context of potential loss of market share, "there is no presumption that money damages will be inadequate." *Polymer*, 103 F.3d at 975; *Roper*, 757 F.2d at 1269, n. 2; *Nutrition*

21. The Court has recently received a motion to exclude the issue of inequitable conduct from the jury's consideration and decide that issue itself. The Court does not here express an opinion as to the outcome of that motion.

*21*, 930 F.2d at 872. Given the trial schedule in this and the related case and the uncontested fact that Schering is a large, financially secure company which will be able to compensate Boehringer for its damages, *see* Tr. at 2.122, the Court concludes that Boehringer's argument for an injunction must fail.[22]

I note that by reaching this conclusion I do not mean to suggest that a party can never demonstrate irreparable harm when an expedited trial schedule is in place. One can easily conceive of several situations, such as when the infringer's products are on the verge of being introduced to a particular market, where irreparable harm could be demonstrated. That is not the case here. Here, the alleged infringement has been ongoing for over three years, the harm alleged by Boehringer is of a long-term nature[23] and a related trial is less than a fortnight away. Given this unique situation, there is little risk that the harm envisioned by Boehringer will occur.

**22.** Even if Boehringer were entitled to a presumption of irreparable harm, that presumption is merely a procedural mechanism "which shifts the ultimate burden of production on the question of irreparable harm onto the alleged infringer." *Reebok*, 32 F.3d at 1556 (*relying on Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1272 (Fed.Cir.1985)); *see also Polymer*, 103 F.3d at 974. The presumption may be rebutted by, for example, evidence that: "(1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion f the patent right can be recompenses with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability." *Polymer*, 103 F.3d at 974 (internal citations omitted). Here, even if Boehringer were entitled to a presumption of irreparable harm, that presumption would be rebutted by the unique facts and procedural posture of this case as detailed above.

**23.** Boehringer has recently submitted to the Court information that Schering intends to launch of "a whole new generation of PRRS vaccines," which Boehringer argues will further impose irreparable harm upon it. Letter

### C. Other Factors

Because Boehringer has failed to satisfy the first two prongs necessary for the imposition of a preliminary injunction, the Court need not make findings on the final two—the balancing of interests and the public interest. *See Reebok* at 1556. Even if those factors weighed in favor of Boehringer, the Court would be unable to enjoin Schering from selling its PRRS vaccines.

## V. *Conclusion*

For the reasons detailed in this opinion, plaintiff's motion for a preliminary injunction is DENIED.[24]

from H.C. Meanor to Court, Oct. 1, 1999. In response, Schering has informed the Court that its new product is merely "a minor line extension." Letter from S. David to Court, Oct. 5, 1999. This new product does not alter the Court's conclusion that Boehringer has failed to bear its burden of demonstrating irreparable harm. It appears that Schering's new product will be reaching the market at about the same the jury will begin receiving evidence in the '778 Patent trial. For the reasons stated above, the unique history and future of this case diminishes the risk that Boehringer will suffer any substantial new harm and whatever harm Boehringer is subject to can be compensated by Schering.

**24.** Although the Court finds that Schering has raised a substantial defense of obviousness and inequitable conduct, the Court does not on this preliminary injunction motion hold conclusively that the '563 Patent is invalid for obviousness or unenforceable due to inequitable conduct. The Court concludes only that Schering has presented a substantial defense at this time. The Court notes, however, that genuine issues of material fact persist in this record such that the issues discussed today cannot be resolved on a summary judgment motion and this Court expects to proceed to trial on the '563 Patent, if necessary, in the Spring of 2000.